**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**James BUCHANON (94–3551), William Reed, Jr. (94–3660), Defendants–Appellants.**

**Nos. 94–3551, 94–3660.**

United States Court of Appeals,
Sixth Circuit.

Argued April 4, 1995.

Decided Dec. 14, 1995.

---

**71.** *See* U.S.S.G. § 2D1.1(c)(1).

Michael J. Burns, Asst. U.S. Atty. (argued and briefed), Office of the U.S. Atty., Columbus OH, for U.S.

Steven M. Brown (argued and briefed), Columbus, OH, for James Buchanon.

Before: KEITH, MARTIN and GUY, Circuit Judges.

MARTIN, J., delivered the opinion of the court, in which KEITH, J., joined. GUY, J., concurred in the result only.

BOYCE F. MARTIN, Jr., Circuit Judge.

Claiming that the district court erred in denying their motions to suppress evidence found in Buchanon's truck, James Buchanon and William Reed, Jr., appeal their convictions for conspiring to possess in excess of five grams of crack cocaine in violation of 21 U.S.C. § 844, and for carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c). Reed's primary argument on appeal is that the district court erred in denying his motion to suppress because the police had seized the defendants, and their personal property, without reasonable suspicion in order to perform a canine narcotics detection sniff on the truck. Buchanon did not raise the seizure issue at the suppression hearing, but raises two other Fourth Amendment claims. He argues that the narcotics detection dog was unreliable and therefore the warrantless search of his vehicle which uncovered approximately thirteen grams of crack cocaine and four handguns was not based on probable cause. He also contends that, even if probable cause existed, the "automobile exception" to the Fourth Amendment's warrant requirement did not apply because his vehicle was disabled. He argues that the troopers should have obtained a warrant prior to searching his truck. Buchanon and Reed raise other trial-related issues, but because we have resolved this case on the seizure issue, we need not address the other issues. Because the district court should have granted the defendants' motions to suppress the evidence, we **REVERSE** the convictions.

On September 21, 1993 at about 8 p.m., Ohio State Highway Patrol Trooper Brian Pack was on patrol on U.S. Route 35 in the vicinity of the Jackson–Gallia county line in southern Ohio. Proceeding eastbound on Route 35, Trooper Pack observed two vehi-

cles on the berm of the road—a small red Nissan automobile parked behind a bluish-black Chevy S–10 pickup truck. Trooper Pack stopped to see if he could assist the motorists, turning on the patrol car's flashing lights as he stopped. Four men were standing by the vehicles, and a fifth man, later identified as Buchanon, was seated behind the wheel of the truck.

Buchanon told Trooper Pack that he was having mechanical difficulties with the truck. Buchanon also told Trooper Pack that he was going from Columbus, Ohio to Charleston, West Virginia and that the man later identified as William Reed, Jr., was going along for the ride. Trooper Pack testified that U.S. 35 passes over the Ohio River into West Virginia. Reed told Trooper Pack that they were having car trouble and asked Pack if he would call a tow truck. Reed told Pack that he had a AAA card. Pack said he would be happy to call a wrecker. Reed offered Pack his AAA card, but Pack told him to keep it. Pack was advised that, although Gallipolis was fifteen minutes away, the wrecker available would take about forty-five minutes to arrive; which turned out to be true. Trooper Pack testified that he felt uneasy about the situation because one of the men, later identified as Whitson, kept shifting his feet and staring at his service weapon. Trooper Pack then radioed for Trooper Richard Meadows to back him up. At 8:17 p.m., about one minute after radioing Meadows, Trooper Victor Knick arrived on the scene and parked his cruiser behind Pack's. Trooper Knick had an audio-video camera mounted in his cruiser which he activated upon his arrival. The police videotape of this incident reveals that Pack called Meadows because he had a canine with him. Trooper Knick testified that Pack's voice is the first one heard on the videotape, *J.A.* at 175, and the first voice on the videotape states "I was hoping Dick would get up here with his dog and just take a walk around it." The district court found, without commenting on this videotape evidence, that Pack called Meadows because he had seen him in the area. *J.A.* at 58.

Trooper Meadows arrived at 8:20 p.m. with "Fando," his German Shepard narcotics detection dog. A fourth trooper, Trooper Jeff Holbert, arrived at the same time as Meadows. Troopers Meadows, Knick and Holbert were all members of a drug interdiction unit. After Holbert's arrival, four Ohio State Highway Patrol cruisers were lined up by the side of the road behind the Nissan, all with lights flashing. What happens next according to the video is crucial to our resolution of the case. The district court, however, discussed little of what happened between 8:20 when Trooper Meadows arrived and 8:22 p.m. when Fando alerted.[1] We will continue with the district court's understanding of the events, and then discuss what happened between 8:20 and 8:22 p.m.

The district court found that shortly after Meadows arrived he spoke briefly with Knick and then proceeded to walk another trooper and Fando around the vehicles. There is nothing in the record or on the videotape to indicate that the troopers asked permission to perform a canine sniff around the vehicles or that Buchanon consented to this procedure. During the sniff, Meadows touched the side of Buchanon's vehicle in a procedure called "detailing." By 8:22 p.m., Fando had alerted to the front driver's door seam of both vehicles. After Fando alerted, the troopers considered the men to be in investigative custody and the troopers performed a patdown search of the men. Finding no guns or contraband on their persons, the troopers performed warrantless searches of both vehicles. The troopers made no attempt to obtain a warrant to search the disabled pickup truck.

As a result of the search of the truck, the troopers found a brown satchel containing four handguns and a brown print bag containing empty aerosol cans with false bottoms behind the passenger seat. One of the aerosol cans contained 13.146 grams of crack cocaine. Drugs were also found in the trunk of the Nissan.

---

1. An alert in the context of a canine narcotics sniff means a reaction given by a trained narcotics detection dog indicating that narcotics are present in the item being sniffed or have been present in such a way as to leave a detectable odor.

At approximately 8:35 p.m., the men were arrested and advised of their Miranda rights. They were handcuffed and told to lie face down on the grass. All of the men responded affirmatively when asked if they understood their rights. Trooper Knick took the brown print bag containing the cans of crack cocaine over to the men and asked them who owned the bag. Reed said that the bag belonged to him. When asked to identify himself, Reed responded that his name was John Reed, then stated that his name was John Thompson.

The men were arrested and taken to the Gallia County Jail where they were again advised of their Miranda rights and presented with written waiver forms. Buchanon signed a rights waiver form. Later, Buchanon claimed ownership of the brown bag, but denied knowing where the guns came from or how they got into his bag.

On November 18, 1993, a grand jury issued an indictment charging both Buchanon and Reed with one count each of violating 21 U.S.C. § 841(a)(1), possession with intent to distribute over five grams of cocaine base, and 18 U.S.C. § 924(c), using or carrying a firearm during and in relation to a drug trafficking crime. Because the government decided it would not introduce into evidence the drugs found in the red Nissan, both Buchanon and Reed filed motions to suppress only the evidence found in Buchanon's truck.

After the January 10, 1994 suppression hearing, the district court issued its opinion and order. It found that the videotape showed that "[t]he men were asked to stand away from the road in a grassy area for their safety" because of the truck traffic and the darkness. The videotape and the testimony of the troopers, however, reveal that the troopers actually instructed the men to move twice.[2] The district court also found that the tape showed that Buchanon, without being asked to do so, got out of his truck and went over to talk with the other men. It cannot be determined from the videotape whether the troopers asked Buchanon to leave his vehicle prior to the general command given by Trooper Knick to the group to move onto the grass and the troopers' testimony on this point was contradictory.[3] What is clear from

2. Trooper Pack testified that shortly after he arrived on the scene he said to the men "Why don't you guys just stay over there alongside of the berm there, that way you won't get hit by anything." *J.A.* at 81, 103. Trooper Knick testified that after his arrival, he too "had everybody that was standing by the vehicles step off to the side in the grass." *J.A.* at 246. The second time the men were instructed to move, the situation was much different. The videotape reveals that Trooper Knick commanded the men to move a second time. Just prior to the second command to move, the men were standing near their vehicles such that the vehicles were between the men and the road. As Meadows (with Fando) and Holbert approached the men, Trooper Knick instructed the group to move over onto the grass, at least a car length away from the vehicles. It is not clear from the video whether Buchanon was still in the truck at this point. Knick's tone of voice is one of command: "Gentlemen, why don't you all come over here on the grass a second if you would please. Just step right on over. There you go. Alright, that's good." He did not tell the men that they were being moved yet again so as not get hit by anything, or for their safety. In fact, Trooper Knick did not testify as to why he asked the men to move. No trooper testified that the men were asked to move to the grass the second time due to the truck traffic. As the men moved away from the vehicles, Meadows and Holbert followed, with Fando, until all five men were back on the grass

faced by the four troopers and Fando. Fando was, at this point, closer to the men than to the vehicles. Then, Meadows and one other trooper began the narcotics sniff of the vehicles. The other two troopers stood between the men and the vehicles, occasionally shining their flashlights on the men. Trooper Pack testified that the men were under the control of the troopers before the search. *J.A.* at 105.

Based on the videotape, the district court clearly erred in concluding that Trooper Knick asked the men to move to the grassy area *prior to* the arrival of Meadows and Holbert and also clearly erred in concluding that the men were asked to move for their safety. The circumstances clearly indicate that the second command was for the purpose of moving the men away from the vehicles so that Meadows could perform the canine sniff. Immediately after moving the men onto the grass, Meadows in fact begins the canine sniff.

3. Trooper Pack testified on direct examination at the suppression hearing and at trial that Buchanon was directed by Trooper Knick to leave his vehicle at this time:

Q: Was Mr. Buchanon ever removed from the truck when Trooper Meadows arrived?

A: It seems to me like he was removed just as soon as he [Knick] got there, or a little bit after. Trooper Knick said: "Why don't you step over here? I want to talk with you."

the video is that none of the men moved away from the vehicles until Trooper Knick told them to do so.

The district court next found that the Troopers engaged in polite and amiable conversation with the men while waiting for the wrecker. The district court's finding is partially correct. The audio portion of the videotape reveals that one of the troopers immediately upon arrival, and prior to Trooper Knick's command that the men move, approached the men and asked about the car trouble. After Trooper Knick had instructed the men to move onto the grass, the troopers' questions became investigatory.[4] As to whether the troopers had reason to suspect the men were committing a crime during this encounter, the district court found that they did not. The district court stated that "[t]he troopers testified that they did not observe any illegal activity prior to the dog's alert and that they relied exclusively on the dog's alert in concluding that probable cause existed to search the vehicle." *J.A.* at 60.

After concluding that Reed had standing to contest the search of the truck because he had claimed an ownership interest in the print bag, *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the district court held that Reed had not been seized. Believing that no seizure had occurred, the district court concluded that Fando's alert gave the troopers probable cause to perform a warrantless search of the vehicles under the "automobile exception" to the warrant requirement of the Fourth Amendment.

At trial, the district court believed the evidence was insufficient to permit the Section 841(a)(1) count (possession with intent to distribute) to be submitted to the jury, and so the court ordered the lesser included offense of possession of a controlled substance,

21 U.S.C. § 844, be submitted. The jury found Buchanon and Reed guilty of violating Section 844 (Count I) and of violating Section 924(c) (Count II). On May 13, 1994, Buchanon was sentenced to consecutive terms of imprisonment of five years and three months on Count I and five years on Count II and a term of three years supervised release. On June 10, 1994, Reed was sentenced to consecutive terms of imprisonment of six years and six months on Count I and five years on Count II followed by a three year term of supervised release. Both defendants timely appealed these judgments.

## I.

In support of his motion to suppress, Reed argued that the troopers had unconstitutionally seized the defendants prior to the canine sniff and that, because the defendants were seized without reasonable articulable suspicion, the canine sniff was unconstitutional. The district court found that no seizure had occurred prior to Fando's alert because "until the dog alerted the men were free to leave." *J.A.* at 65. The district court believed that no seizure took place because the troopers did not stop or detain the truck, and because it reasoned that the five men could have left at any time in the Nissan. *Id.* The district court determined that the troopers took no action to lead the defendants to believe that they were not free to leave. *Id.* at 65–66.

## A.

In *United States v. Taylor,* an *en banc* decision, this Court framed the standard of review regarding seizure determinations as: "The *finding* that a citizen has been subjected to a fourth amendment search or seizure

---

Suppression Hearing, *J.A.* 85.
 Trooper Knick was not asked at the suppression hearing about what, if anything, he said to Buchanon during this encounter.

4. While the men were back on the grass, with two troopers stationed between them and the vehicles, the troopers asked investigative questions. A trooper asked one of the men about a bulge in his pocket. "You've got an awful big bulge in your pocket? What do you have in there?" The man answered that it was a "snot rag." A trooper directed the man to remove the

rag from his pocket. While removing the rag, a ring fell from the man's pocket onto the grass. Shortly thereafter, a trooper asked the group, "No one has any machine guns or machetes in their pockets, do ya? or bazookas?" The answer "No" came from someone in the group to each of these inquiries. All of this questioning occurred while the canine sniff was being performed. In its decision, the district court did not mention the investigatory questioning which took place.

*involves* a question of fact and cannot be reversed unless clearly erroneous." *United States v. Taylor,* 956 F.2d 572, 576 (6th Cir.) (en banc) (quoting *United States v. Grant,* 920 F.2d 376, 381 (6th Cir.1990)), *cert. denied,* 506 U.S. 952, 113 S.Ct. 404, 121 L.Ed.2d 330 (1992) (emphasis added). This quote is confusing because it suggests that a seizure determination, which indeed *involves* a question of fact, should be reviewed as if the district court decided *only* a question of fact. The Court apparently realized that a seizure determination is not *solely* a question of fact when it stated, in an equally confusing manner, that

> [t]he district court's *factual* conclusion in the instant case that the initial encounter was not a "seizure" was factually supported by the record developed below, and was, as a *matter of law,* fully consistent with the published opinions of the Supreme Court. . . .

*Taylor,* 956 F.2d at 577 (citing *United States v. Mendenhall,* 446 U.S. 544, 555, 100 S.Ct. 1870, 1877–78, 64 L.Ed.2d 497 (1980)) (emphasis added). Of course, if the conclusion as to whether a "seizure" occurred was solely a *factual* finding, then there was no need for the *Taylor* Court to examine other Supreme Court opinions to determine whether the district court's *factual* conclusion was consistent with factual scenarios in other Supreme Court cases. The *Taylor* Court's need to compare the district court's finding that there was no seizure with Supreme Court precedent arises because a seizure determination is not solely a factual question, but requires a conclusion of law; namely, whether, as a matter of law, a reasonable person would feel free to leave the encounter.

 The answer to the question "whether a reasonable person would feel free to leave" requires the application of a legal test, and does not require a district court to weigh the credibility of specific witnesses or to decide between conflicting evidence. Instead, the district court must determine how the legal construct, "the reasonable person," would feel. *See Michigan v. Chesternut,* 486 U.S. 567, 574, 108 S.Ct. 1975, 1980, 100 L.Ed.2d 565 (1988) (applying the objective "reasonable person" test to the facts of that case). Thus, a court's conclusion that no seizure occurred is a legal conclusion. Justice Marshall summarized this standard in *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), when he observed, "because the issue whether a seizure has occurred in any given factual setting is a question of law, see … *Mendenhall,* 446 U.S. 544, 554–555 [100 S.Ct. at 1877–1878] … nothing prevents this Court from deciding on its own whether a seizure occurred based on *all* of the facts of this case. . . ." *Id.* at 446, 111 S.Ct. at 2392 (J. Marshall, dissenting) (citation omitted) (emphasis in original); *see Mendenhall,* 446 U.S. at 551 n. 5, 100 S.Ct. at 1875 n. 5 (stating that "the correctness of the legal characterization of the facts appearing in the record is a matter for this Court to determine.") (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *Bumper v. North Carolina,* 391 U.S. 543, 548–550, 88 S.Ct. 1788, 1791–1792, 20 L.Ed.2d 797 (1968)).

Our understanding of the standard of review for seizure determinations has been articulated by other panels of this Circuit in cases both prior to and following *Taylor. United States v. Coleman,* 628 F.2d 961, 963 (6th Cir.1980) (holding that the district court's legal conclusion that defendant's personal property was seized by the police was error because the district court clearly erred in the underlying factual findings); *United States v. Williams,* 962 F.2d 1218, 1221 (6th Cir.) (stating "[a] district court's factual findings made in consideration of a motion to suppress evidence are to be upheld unless they are clearly erroneous. . . . However, the district court's conclusions of law are subject to *de novo* review on appeal. *See Whitney* v. Brown, 882 F.2d 1068, 1071 (6th Cir.1989).[5]"), *cert. denied,* 506 U.S. 892, 113 S.Ct. 264, 121

---

5. In *Whitney v. Brown,* this Court said that findings of fact are reviewed under a clearly erroneous standard, legal conclusions are reviewed *de novo,* but that "findings of ultimate facts based upon the application of legal principles to subsidiary facts is also subject to *de novo* review upon appeal." *Brown,* 882 F.2d at 1071 (citation omitted). We believe that a seizure would be considered an "ultimate fact" under the *Brown* court's approach given that a district court will have to apply a principle to subsidiary facts to determine whether a seizure occurred.

L.Ed.2d 194 (1992); *United States v. Garza,* 10 F.3d 1241, 1245 (6th Cir.1993) (stating that a district court's findings upon review of a denial of a motion to suppress are reviewed for clear error; however, "[t]he ultimate determinations as to the legality of the stop ... are conclusions of law, which we review *de novo.*") (citing *United States v. Fountain,* 2 F.3d 656, 661 (6th cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 608, 126 L.Ed.2d 573 (1993)); *United States v. Baro,* 15 F.3d 563, 566 (6th Cir.) (stating "[w]hile this Court reviews the district court's factual findings on suppression issues for clear error, we analyze the district court's conclusions of law under a *de novo* standard."), *cert. denied,* — U.S. ——, 115 S.Ct. 285, 130 L.Ed.2d 201 (1994).

Thus, we look here at the district court's legal conclusion that a seizure occurred in this case *de novo* based upon underlying factual findings that will be disturbed only if clearly erroneous. *Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–1512, 84 L.Ed.2d 518 (1985) (holding that this Court may disturb the district court's findings only if it is firmly convinced that an error has been made). In reviewing the district court's factual findings, we consider the evidence in the light most favorable to the government. *Garza,* 10 F.3d at 1245 (citation omitted).

### B.

The Fourth Amendment provides that:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable case, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. This Amendment protects, in part, the ability of persons to move or travel about the United States without fear of being stopped or detained unless the police have an adequate constitutional justification for doing so. *Brinegar v. United States,* 338 U.S. 160, 177, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949) (The citizen traveling on the highway "who has given no good cause for believing he is engaged in [illegal] activity is entitled to proceed on his way without interference."); *Shapiro v. Thompson,* 394 U.S. 618, 629–30, 89 S.Ct. 1322, 1328–1329, 22 L.Ed.2d 600 (1969) (discussing the right to freedom to travel throughout the United States). Further, the Supreme Court has said that "freedom of movement is the very essence of our free society, setting us apart. Like the right of assembly and the right of association, it often makes all other rights meaningful...." *Aptheker v. Secretary of State,* 378 U.S. 500, 520, 84 S.Ct. 1659, 1671, 12 L.Ed.2d 992 (1964) (Douglas, J. concurring); *see also Carroll,* 267 U.S. at 154, 45 S.Ct. at 285 (stating that "those lawfully within the [United States], entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official ... probable cause for believing that their vehicles are carrying contraband"); *see generally* Tracey Maclin, *The Decline of the Right of Locomotion: The Fourth Amendment on the Streets,* 75 Cornell L.Rev. 1258 (1990) (examining how the Supreme Court's "right-to-inquire" rationale has resulted in diminished Fourth Amendment protection of freedom of movement).

To protect citizens from arbitrary invasions of their personal security and to implement the other Fourth Amendment guarantees, the Supreme Court has developed a legal test for determining whether a seizure has occurred. *See Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870. In *Mendenhall,* three plain clothes drug enforcement agency officers approached Mendenhall in an airport because she fit a drug courier profile in order to ask her some questions. In concluding that Mendenhall had not been seized, the Supreme Court stated that

a person has been seized within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the dis-

**1224**

play of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

446 U.S. at 554, 100 S.Ct. at 1877 (internal quotations and footnote omitted) (citing *Terry v. Ohio*, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1879, n. 16, 20 L.Ed.2d 889 (1968) and other citations); *Grant*, 920 F.2d at 382 (stating that "[t]his court's traditional test asks: in light of all of the circumstances, would 'a reasonable person ... have believed that he or she was not free to walk away.' ") (citing *United States v. Saperstein*, 723 F.2d 1221, 1225 (6th cir.1983)). Under *Mendenhall* a district court must examine the "totality of the circumstances" to determine whether a seizure occurred. *Mendenhall*, 446 U.S. at 557, 100 S.Ct. at 1878–1879. Examining the totality of the circumstances, the Supreme Court concluded that Mendenhall was not seized because

> [t]he events took place in the public concourse [of the airport]. The agents wore no uniforms and displayed no weapons. They did not summon the respondent to their presence, but instead approached her and identified themselves as federal agents. They requested, but did not demand to see the respondent's identification and ticket. Such conduct without more, did not amount to an intrusion upon any constitutionally protected interest. The respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions. Nor was it enough to establish a seizure that the person asking the questions was a law enforcement official.... In short, nothing in the record suggests that the respondent had any objective reason to believe that she was not free to end the conversation in the concourse and proceed on her way, and for that reason we conclude that the agents' initial approach to her was not a seizure.

*Id.* at 555, 100 S.Ct. at 1877–1878 (citations omitted).

■ The relevant constitutional query, then, is whether under the totality of the circumstances a reasonable person would have felt free to end this encounter. In determining that a seizure did not occur in the case now before us, the district court considered a few factors about this encounter, but not the totality of the circumstances. First, the district court did not discuss whether the presence of four troopers was a threatening presence. *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. Although this encounter began as a motorist assistance stop by Trooper Pack, within a few minutes three other troopers had converged on the scene. The number of officers that arrived, the swiftness with which they arrived, and the manner in which they arrived (all with pursuit lights flashing) would cause a reasonable person to feel intimidated or threatened by this type of police presence. This is not to say that the men were seized at the moment the four troopers arrived on the scene. This circumstance, by itself, is not enough to cause a reasonable person to feel that he or she is not free to leave. However, the troopers did not end their actions here.

■ Second, the district court found that the troopers did not "stop or detain" the defendants. We understand the district court to mean that because the defendants were not prevented by the troopers from continuing their journey that no detention occurred. However, because the troopers did nothing to cause the defendants to interrupt their journey does not mean that a seizure did not occur. A person can be detained even when not in motion and proceeding to some destination. *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877 (stating that a seizure can occur "even where the person did not attempt to leave"). Thus, in *United States v. Grant*, we held that a seizure occurred when the defendant, who was sitting in his seat on an airplane asleep, was awakened by border patrol agents a second time so that they could continue their investigation. 920 F.2d at 382–84. We held that Grant was seized when awakened and required by the agents to accompany them off the plane. *Id.* at 384. Thus, law enforcement officers need not physically stop a person in order for a seizure to occur, although using their authority to stop a person would

be a factor in determining whether a seizure had occurred. *Chesternut,* 486 U.S. at 575, 108 S.Ct. at 1980 (reasoning that a seizure did not occur, in part, because the police did not order the fleeing person to halt or cut across the person's path with the police cruiser). Neither does a detention need to be long-lived to be a seizure. The Supreme Court has also observed that an unconstitutional seizure can occur even if the police detain a person only momentarily. *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) ("[A person] may not be detained even momentarily without reasonable, objective grounds for doing so") (citing *Mendenhall,* 446 U.S. at 556, 100 S.Ct. at 1878)).

By the time the four troopers arrived, Trooper Pack had already exhibited his authority by requesting that the men step back onto the berm for their safety. Nevertheless, we believe that a reasonable person would have felt free to leave after Pack's request. However, when Trooper Knick gave the order to move back another fifteen feet or so onto the grass, when two troopers stood between the men and their vehicles, and when Trooper Meadows brought Fando towards the men and the vehicles, a reasonable person would not have felt free to leave the encounter and a seizure occurred. Fando's presence alone sent a double message to the defendants. Bringing the dog out was a show of force because these men did not know why Fando was present until the sniff began; and when the sniff began, it would have been clear to a reasonable person that a drug investigation was underway and that the troopers would not permit access to the vehicles during the dog sniff.

Another factor convincing us that a seizure occurred is the setting of this incident. The Supreme Court has stated that the setting of the police-citizen encounter is a factor to consider in determining whether a reasonable person would feel free to leave. *Chesternut,* 486 U.S. at 573, 108 S.Ct. at 1979 ("Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.") Here, the district court did not consider the setting of this encounter. The defendants were on a stretch of highway in rural area, fifteen minutes from the nearest wrecker (if one were immediately available). It was night, and when the men were asked to move the second time the troopers directed the men away from the lights of passing vehicles and into the shadows. While a reasonable person may have felt free to leave the vehicles prior to the canine search, no reasonable person would feel free to leave after being asked to move away from the vehicles to allow Trooper Meadows to conduct the canine search of the vehicles. Obviously, the troopers were not going to allow the vehicles to depart while Meadows was leading Fando around the vehicles, and the fact that two troopers positioned themselves between the men and the vehicles bolsters this conclusion.

Finally, "[t]he subjective intent of the officers is relevant to an assessment of the fourth amendment implications of police conduct *only to the extent that that intent has been conveyed to the person confronted."* *United States v. Rose,* 889 F.2d 1490, 1493 (6th Cir.1989) (citing *Mendenhall,* 446 U.S. at 554 n. 6, 100 S.Ct. at 1877 n. 6) (emphasis added). The very act of bringing Fando out to sniff the vehicles tells a reasonable person "we are investigating you for drugs and you may not move these vehicles until we are through." This case is similar to *United States v. Fifty–Three Thousand Eighty–Two Dollars in United States Currency,* 985 F.2d 245 (6th Cir.1993), where this Court held that DEA agents operating in an airport had "seized" currency from two claimants when they told the claimants that the money in their gym bags would be tested by a narcotics detection dog. *Id.* at 248. At the time this statement was made, this Court held that the claimants were being detained for investigatory purposes without reasonable suspicion. *Id.* at 249. We believed that the agents' communication of their intent to subject the money to a sniff was a meaningful interference with the possessory interests of the claimants in the currency, and therefore a violation of the Fourth Amendment, because the men were not given a choice in the matter and were not asked to consent. *Id.* at

248. Likewise, in the present case, the defendants were not given a choice as to whether the dog sniff would occur; the troopers just did it without asking. We believe the drug sniff is more coercive than police questioning of a citizen in a place where he or she may easily leave the police presence because a person who wants to end the canine sniff has to either 1) remove their personal property from the presence of the dog, or 2) has to convince the police to stop their actions. Ending this type of encounter is much more difficult than refusing to answer police questions and being able to walk away. In the latter situation, the risk of coercive police behavior is far reduced because the citizen has more control over ending the encounter.

Under the circumstances presented by this case, we are convinced that the district court erred in some of its underlying factual findings regarding whether a seizure occurred and simply ignored other significant facts as is evident from the videotape of this occurrence. We conclude that the district court erred in its application of the legal principles of *United States v. Mendenhall* in concluding that no seizure occurred. We conclude that under the totality of the circumstances a reasonable person would not have felt free to leave this encounter with the Ohio State troopers.

## II.

■ Concluding that a seizure occurred, we also conclude that it was unlawful under the *Terry v. Ohio* line of cases because the troopers did not have reasonable and articulable suspicion for seizing the defendants, and the truck, for a limited investigatory purpose. *Terry,* 392 U.S. at 21, 27, 88 S.Ct. at 1879–1880, 1883; *Baro,* 15 F.3d at 568; *United States v. Taylor,* 917 F.2d 1402, 1405 (6th Cir.1990). Because the troopers had no reasonable suspicion to detain these men, even for a few minutes, the evidence found as a result of the exploitation of this illegal seizure should have been suppressed. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Grant,* 920 F.2d at 389–90. As the Supreme Court stated in *Wong Sun:*

We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting the establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

371 U.S. at 487–88, 83 S.Ct. at 417 (quotation omitted). This case fits squarely within *Wong Sun's* fruit of the poisonous tree analysis. Furthermore, the connection between the conduct of the troopers and the evidence is not attenuated, and therefore the taint remains. *Id.* at 487, 83 S.Ct. at 417 (citing *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 267–268, 84 L.Ed. 307 (1939)). Additionally, no other doctrine, such as independent source or inevitable discovery, applies to make the otherwise tainted evidence admissible. *Murray v. United States,* 487 U.S. 533, 537, 108 S.Ct. 2529, 2533, 101 L.Ed.2d 472 (1988) (discussing the independent source doctrine); *Nix v. Williams,* 467 U.S. 431, 443 & n. 4, 104 S.Ct. 2501, 2509 & n. 4, 81 L.Ed.2d 377 (1984) (discussing the inevitable discovery doctrine). We hold, that when a canine narcotics sniff is performed as the result of the exploitation of a primary illegality, the fruits of that canine sniff must be suppressed. Accordingly, the district court should have excluded the evidence found in the search based upon Fando's alert. *Segura v. United States,* 468 U.S. 796, 804, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984); *Terry,* 392 U.S. at 13, 88 S.Ct. at 1875 (reasoning that the exclusionary rule is properly applied where it will serve as an effective deterrent to unconstitutional police behavior).

## III.

■ Only defendant Reed, and not Buchanon, argued with specificity in his motion to suppress that the defendants had been seized by the troopers in violation of the Fourth Amendment. Buchanon argued generally that the troopers illegally seized him in violation of his Fourth Amendment rights, but he did not specify when the seizure occurred—before the dog sniff or after the alert. Bu-

chanon forfeited the pre-sniff seizure argument by not raising it with specificity. Fed. R.Crim.P. 12(f). However, we may still consider whether the district court's decision to deny Buchanon's motion to suppress was plain error. Fed.R.Crim.P. 52(b) ("plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."); *United States v. Finch,* 998 F.2d 349, 355 (6th Cir.1993) ("[A]n appellate court may take notice of an error on its own motion though it is never put forward by counsel.") (quoting 3A Charles A. Wright, *Federal Practice and Procedure,* Criminal 2d § 856); *United States v. Griffin,* 382 F.2d 823, 828 (6th Cir.1967) (stating that "an appellate court may take notice on its own motion of ... [plain] error.").

Our plain error review has been shaped by the recent Supreme Court case of *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). We discussed *Olano* in *United States v. Thomas,* 11 F.3d 620 (6th Cir.1993). In *Thomas,* we concluded that, when a defendant fails to raise a timely objection, our inquiry under Fed.R.Crim.P. 52(b) is four-fold:

> First, we are to consider whether an error occurred in the district court. Absent any error, our inquiry is at an end. However, if an error occurred, we then consider if the error was plain. If it is, then we proceed to inquire whether the plain error affects substantial rights. Finally, even if all three factors exist, we must then consider whether to exercise our discretionary power under Rule 52(b), or in other words, we must decide whether the plain error affecting substantial rights seriously affected the fairness, integrity or public reputation of judicial proceedings.

*Thomas,* 11 F.3d at 630.

■ Here, the district court erred in concluding that no seizure occurred in this case. As a result of this error, the Fourth Amendment right of the defendants to be free from suspicionless seizures was violated. "Deviation from a legal rule is 'error' unless the rule has been waived." *Olano,* 507 U.S. at 732–33, 113 S.Ct. at 1777. In this case, the defendants did not waive their Fourth Amendment right by a knowing and voluntary consent to be seized. *Id.* (stating "forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.' ") (citation omitted).

Second, the error was "plain." *Id.* (stating that plain error is clear or obvious). We believe it is clear from the evidence in the record, including the videotape recorded by a camera mounted on the dash of one of the state police cars, and well-established law that a seizure occurred. The presence of four troopers at this motorist assistance stop contributed to the intimidating law enforcement presence in this case; the troopers performed several acts or issued commands to control the movements of these defendants; the troopers communicated to the men by their actions that they were being controlled for the purpose of performing a dog sniff on their vehicles. Although none of the troopers drew a gun, Trooper Meadows brought Fando toward the men as they moved the men away from the vehicles. By not telling the men Fando was a narcotics dog, and not also trained for attack or protection, the men had no way of knowing that the dog was not present for the protection of the troopers or to control the men's movements. These key facts and others discussed above make it obvious to us that Buchanon and Reed were seized.

Third, the error in this case did affect a substantial right of the defendants and the admission of evidence which should have been excluded did have a prejudicial impact on the jury. *Olano,* 507 U.S. at 734–36, 113 S.Ct. at 1778.

Finally, we will exercise our discretion to conclude that the error was plain because the integrity and public reputation of a judicial proceeding is at stake. Manifest injustice would result if Reed's conviction, but not Buchanon's, were reversed. *Id.* (stating that "the discretion conferred by Rule 52(b) should be employed 'in those circumstances in which a miscarriage of justice would otherwise result.' ") (citation omitted). In this case, the district court had the opportunity to fully consider the seizure issue as it pertained to both defendants, even though Bu-

chanon did not raise the issue, because Buchanon and Reed were treated identically by the troopers. In fact the district court found that "[u]ntil the dog alerted, the *men* were free to leave," *J.A.* at 64 (emphasis added), and thus found that no seizure occurred as to all five men, and not just the defendants. The only difference in the defendants' cases is the fact that the troopers interfered with Buchanon's possessory interest in his truck, whereas the troopers interfered with Reed's possession of his bag.

## IV.

The Fourth Amendment protects a person's freedom to travel and freedom to enjoy his or her personal property without interference from the police absent consent or reasonable suspicion or probable cause that a crime has been, will be, or is being committed. Trooper Meadows testified that as part of his drug interdiction unit's investigative method, he "automatically" uses Fando to perform a narcotics sniff on every vehicle his unit stops. *J.A.* at 116. So long as Trooper Meadows uses Fando on an unattended vehicle[6] or unattended personal property,[7] or so long as the canine sniff is performed on legally seized personal property pursuant to a legal seizure of a person,[8] the canine sniff would not be unconstitutional. The troopers' actions here, however, are unconstitutional and unconscionable. If law enforcement officers are permitted to illegally seize persons in order to attempt to uncover evidence of criminal conduct, then the Fourth Amendment right of persons in this country to go about their business free from baseless interference from the police has been extinguished. Thus, we hold that a canine narcot-

ics sniff made possible by an unconstitutional *Terry* seizure violates the Fourth Amendment. The district court should have granted the defendants' motions to suppress the evidence discovered after their unconstitutional seizure.

The judgments of the district court are REVERSED.[9]

---

6. *United States v. Ludwig*, 10 F.3d 1523 (10th Cir.1993).

7. *United States v. Lewis*, 708 F.2d 1078 (6th Cir. 1983).

8. *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).

9. Although we are reversing Buchanon and Reed's convictions because the guns and drugs found in their possession should have been suppressed, we note that the recent Supreme Court decision in *Bailey v. United States*, —— U.S. ——,

116 S.Ct. 501, 133 L.Ed.2d 472 (1995) may provide a ground for partial reversal of the convictions on the Section 924(c) counts. In *Bailey*, the Supreme Court held that "[Section] 924(c) requires evidence sufficient to show an active employment of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." *Id.* at ——, 116 S.Ct. at 505. However, because we are reversing the convictions on the seizure issue, we need not address whether Buchanon and Reed's actions constituted "using" or "carrying" a firearm during and in relation to a drug trafficking crime.