**UNITED STATES of America,**

v.

**Oscar Marvin PAGE, et al.**

**No. 2:00–00016.**

United States District Court, M.D. Tennessee.

July 11, 2001.

tint of the windows by a fleeting glance in this brief interval.

Jimmie Lynn Ramsaur, Office of the U.S. Attorney, Nashville, TN, for United States.

Julie Elizabeth Officer, Livingston, TN, Charles R. Ray, Nashville, TN, for Jerry Wayne Sherrill.

Thomas J. Drake, Jr., Craig & Drake, Nashville, TN, for Tim Grover Ledford.

## MEMORANDUM

HIGGINS, District Judge.

This matter is before the Court on the motion (filed February 20, 2001, Docket Entry No. 397) of the defendant, Tim Grover Ledford, to suppress, to which the government has responded. (Response filed April 16, 2001, Docket Entry No. 567). Defendant Tim Ledford has been charged in count nineteen of the indictment in this action with knowingly, intentionally and unlawfully possessing and attempting to possess with intent to distribute a quantity of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and 18, U.S.C. § 2. He has filed a motion to suppress any mention of a stop and search of his vehicle conducted by law enforcement officers on May 18, 2000, as well as the set of digital scales discovered and seized in that search.

### I.

The Court held an evidentiary hearing on this matter on May 31, 2001, at which Monterey Police Officer Tim Murphy and Putnam County Sheriff's Deputy James Gregory Whittaker testified. The Court credits the testimony of these witnesses, which is summarized in pertinent part as follows.

During the afternoon of May 18, 2000, Officer Murphy spoke with Sam Lee, an agent of the drug task force and employee of the Putnam County Sheriff's Department. Information given to Officer Murphy by Mr. Lee was admitted for the purpose of establishing the basis for Offi-

cer Murphy's actions, as opposed to proof of the matter asserted. This information was to the effect that a red Chevrolet pick-up truck bearing license plate "PRO-GUN1" might be traveling through the area, possibly transporting cocaine. Officer Murphy was aware or made aware that the vehicle would likely be traveling toward the community of Crawford, where the defendant resides.

Based on this information, Officer Murphy set up his patrol on North Chestnut Street near Cleveland Avenue. Officer Murphy subsequently spotted and began to follow the described red pick-up truck on North Chestnut Street, which has several curves at the outskirts of town. Officer Murphy saw the truck cross the double yellow center line of the highway twice, swerving each time to the outside of a curve, as opposed to swerving in to shorten a curve. Both of the driver's side tires were briefly crossing the double yellow center line by approximately a tire's width. This occurred within Monterey, and Officer Murphy testified that crossing the center line was a violation of a Monterey ordinance requiring that drivers stay within marked lanes on laned streets. Officer Murphy activated his blue lights in order to pull the vehicle over. At this time Deputy Whittaker, who had also been looking for the described red truck and had spotted it previously in a grocery store parking lot, was following a few cars behind Officer Murphy.

The driver continued driving and crossed the center line two additional times, at which point Officer Murphy activated his siren to get the driver's attention. The driver then pulled off to the right shoulder of the road. Because Officer Murphy was concerned about safety on the shoulder of the road, he pulled alongside the truck and requested its driver to pull forward a few hundred yards into a parking lot approximately half a mile out-side of Monterey. The driver complied, and Officer Murphy followed him into the parking lot at approximately 5:15 p.m. Officer Whittaker arrived in the parking lot almost immediately thereafter, along with his narcotics detection dog, and at some point a third officer, Deputy Harris also arrived at the scene.

Once in the parking lot, Officer Murphy exited his patrol car, approached the pick-up truck and asked the driver for his driver's license. The license was produced, identifying the driver as Tim Ledford, whom Officer Murphy identified as the defendant in the courtroom. Officer Murphy asked the defendant if he had been drinking alcohol that afternoon, and the defendant responded in the negative, asserting that he had been working in Nashville all day, and that he was tired and trying to get home. Officer Murphy noted that the defendant's hands were shaking quite vigorously, and that he appeared to be overly nervous in comparison to the hundreds or thousands of previous traffic stops Officer Murphy had made.

At some point during the stop, the defendant asked why he had been pulled over, and Officer Murphy told him that he had been stopped for crossing the center line. Officer Murphy did not tell the defendant about the information supplied by the drug task force agent. Officer Murphy radioed for a check on the driver's license, and watched the defendant while he waited approximately one minute for the response that it was valid with no outstanding violations. After speaking with the defendant, Officer Murphy did not suspect that the defendant had been drinking. No traffic citation was issued as a result of the stop.

Officer Murphy asked the defendant if he had any illegal weapons or drugs in the car, to which the defendant responded in the negative. Officer Murphy then asked

if he could search the defendant's vehicle. The defendant responded that he would rather the officers did not search his vehicle without a warrant. Officer Murphy then told the defendant that the officers had a narcotics detection dog and could walk it around the vehicle without a warrant and search the vehicle if the dog alerted. At that point, the defendant said "go ahead and search—all you will find is my .22 caliber rifle hanging in the rear window." Although the Monterey Police Department uses search consent forms, Officer Murphy testified that he did not have a form with him on the date in question. He did not ask whether any of the other officers present had such a form, and does not know whether or not they did.

Officer Murphy then told Deputy Whittaker, in the defendant's presence, that they had consent to search. The defendant voiced no objection. Deputy Whittaker then retrieved the dog, Casey, from the kennel in the back of his vehicle, gave her the command to search, and walked her around the truck. The dog alerted at the seam around the driver's door by becoming excited and getting up on her hind legs and lunging at the door. Officer Whittaker praised the dog for alerting, then opened the door and let her in the cab of the truck, where she alerted very aggressively by becoming excited and scratching at the dashboard. The dog did not alert anywhere else in the cab or the bed of the truck. Deputy Whittaker rewarded Casey with a toy, and returned her to the kennel in his vehicle.

After the dog's alert, Officer Murphy and Deputy Whittaker conducted a search of the truck, and discovered a set of digital scales that had been hidden from sight under the dashboard. The defendant denied ownership of the scales or knowledge that they were in his truck. No drugs were found in the truck, and the government concedes that examination of the scales has produced no drug residue or fingerprints. The entire stop lasted less than an hour, during which time the defendant never said anything about wanting to leave. Officer Murphy took possession of the scales, but ultimately permitted the defendant to leave in his vehicle without arrest or citation.

Deputy Whittaker testified that he has been handling Casey, his first narcotics dog, since July 1999. He and Casey have received training from Advanced Canine Kennels in Scottsville, Kentucky, as well as the United States Police Canine Association (USPCA). Once each year he and Casey are certified and undergo two weeks of training at Advanced Canine Kennels by a certified trainer with thirty years' experience. In addition, he meets with up to fifteen other handlers and their dogs frequently throughout the year for regular training.

Deputy Whittaker testified that narcotics dogs are trained to detect the scent of four specific drugs: cocaine, heroine, marijuana and crystal methamphetamine. During training sessions these drugs and other items that have been associated with the scent of drugs are hidden, and Casey is called upon to find and "alert" on these drugs or items. What constitutes an alert is determined by the handler, in conjunction with standards set forth by the ASPCA and followed by Advanced Canine Kennels. Handlers receive training on how a dog alerts, and Deputy Whittaker testified that Casey alerts aggressively by getting very excited, shaking and scratching; she does not bark to alert. Deputy Whittaker puts Casey into work mode by saying to her "show me dope." When she alerts on drugs or drug-scented articles in training, she is rewarded with praise and/or her tennis ball. When she incorrectly alerts during training, she receives pressure, but not enough to cause pain, on her collar.

Deputy Whittaker testified that Casey has been very successful in training and actual performance, which is supported by Exhibit 1, copies of Deputy Whittaker's records of Casey's performance. He testified that there are times when she alerts and no drugs are actually found, but that the scent of drugs can linger according to the type of material involved, and that such an alert to the scent alone is still considered a successful alert. Based on Deputy Whittaker's testimony and the records contained in Exhibit 1, Casey is an appropriately trained, experienced and reliable narcotics detection dog.[1]

## II.

A search conducted without a warrant and probable cause is unreasonable for the purposes of the Fourth Amendment, subject to very few exceptions. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). One such exception provides for the warrantless search of a vehicle when the vehicle has been lawfully stopped and there is probable cause for the search. *United States v. Ross,* 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *United States v. Crotinger,* 928 F.2d 203, 205 (6th Cir.1991). Regardless of probable cause, another exception to the search warrant requirement is the consent of the person whose property is subjected to the search. *Schneckloth* at 219, 93 S.Ct. 2041. Justification for a search in this case under either exception requires a two-step analysis. First, the Court must consider whether the vehicle was lawfully stopped. If so, the Court must determine whether, after the stop, the officers lawfully developed either probable cause or consent for a search.

## A. The Stop

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Supreme Court of the United States has found that the stop of an automobile and the temporary detention of individuals during the stop, "even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Where the police have probable cause to believe that a traffic violation has occurred, the Supreme Court has found that the decision to stop an automobile is reasonable. *See Delaware v. Prouse,* 440 U.S. 648, 659, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Further, as long as a traffic stop is supported by probable cause to believe that a traffic violation has occurred, the fact that the stop is in fact a pretext for other investigation is constitutionally irrelevant. *Whren;*

---

1. The defendant has filed a memorandum (filed June 7, 2001; Docket Entry No. 699) wherein he asserts that because Casey's records include nineteen alerts that produced no drugs or that the defendant otherwise deems improper alerts, Casey's reliability is not sufficient to constitute probable cause. The Court believes that the defendant has misconstrued certain records by including in his count of improper alerts several instances when Casey alerted to property where no drugs were found, but where other evidence clearly corroborated the recent presence of drugs and their lingering odor. See, e.g., search records dated October 18, 1999 (dog alerted on locker of student who admitted having recently possessed drugs); February 6, 2000 (dog alerted on passenger side of car where individual found to be carrying drugs and drug paraphernalia had been sitting); December 8, 2000 (dog alerted on locker wherein Deputy Whittaker noted a strong smell of burnt marijuana, and student admitted marijuana use). However, even using the defendant's own figures of 19 improper alerts out of 179 actual searches results in an accuracy level of almost ninety percent. Casey's low percentage of improper alerts does not prevent her from being considered reliable. *See United States v. Diaz,* 25 F.3d 392, 395–96 (6th Cir.1994).

*United States v. Bradshaw,* 102 F.3d 204, 210 (6th Cir.1996).

■ In this instance Officer Murphy's superficial reason, although not his genuine motive, for the traffic stop was the defendant's crossing the double yellow center line of the highway several times in a short distance. The Court concludes that this was sufficient cause for the stop. In addition to Officer Murphy's testimony that the manner in which the defendant was driving violated a Monterey ordinance, crossing a solid yellow center line constitutes a statutory traffic violation on any Tennessee highway. *See* Tenn.Code Ann. § 55–8–121 (authorizing department of transportation to designate no-passing zones); *Kelley v. Johnson,* 796 S.W.2d 155, 157, 158 (Tenn.Ct.App.1990) (noting that solid yellow line designates no-passing zone, crossing of which is violation of § 55–8–121).

Moreover, the defendant's driving appears to have violated Tenn.Code Ann. § 55–8–123, which requires that "[w]henever any roadway has been divided into two (2) or more clearly marked lanes for traffic, ... [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." Tenn.Code Ann. § 55–8–123(1). The fact that the defendant partially left his lane several times in a short distance, and in doing so crossed the center line into the lane of on-coming traffic, readily distinguishes this case from *United States v. Freeman,* 209 F.3d 464 (6th Cir.2000), wherein the Sixth Circuit held that observing a motor home briefly enter the outside emergency lane once did not constitute probable cause for a stop. *Id.* at 466 (isolated incident of partially weaving into emergency lane for a few feet did not constitute failure to keep within a single lane "as nearly as practicable").

Accordingly, the Court determines that Officer Murphy made a lawful traffic stop of the defendant's vehicle on the date in question.

## B. The Search

### i. Probable Cause

■ It is well settled that a narcotics detection dog's alert to the presence of contraband within a vehicle establishes probable cause justifying a search of the vehicle for contraband. *See United States v. Diaz,* 25 F.3d 392, 393–94 (6th Cir.1994); *United States v. Knox,* 839 F.2d 285, 294 n. 4 (6th Cir.1988), *cert. denied,* 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989). Although the exterior drug sniff itself is not a search for the purposes of the Fourth Amendment, *see United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the Fourth Amendment does prohibit the unreasonable detention of an individual or vehicle in order to conduct such a sniff.

■ When a lawful traffic stop has been made, an officer may properly detain the driver while making radio checks and issuing citations, which are "well within the bounds of the initial stop." *United States v. Wellman,* 185 F.3d 651, 656 (6th Cir. 1999) (quoting *Bradshaw* at 212). Officers may lawfully question drivers about contraband and seek consent to search while these initial purposes are on-going. *United States v. Palomino,* 100 F.3d 446, 449–50 (6th Cir.1996). Officers may even conduct exterior canine drug sniffs during this period of time, regardless of reasonable suspicion, so long as doing so does not prolong the detention any longer than is necessary for the purposes of the traffic stop:

There is no need to find "illegal action or evidence of illegality" [in order to conduct a drug sniff] unless there is also a

need to justify continued detention of a vehicle. Although it is true that no independent "cause" or "suspicion" of illegality was testified to herein, none was needed because there was no undue or extended detention. There was, in fact, not only no *undue* detention, there was no detention at all other than that which was inextricably tied to the legitimate traffic stop and its aftermath.

*United States v. Taylor,* 955 F.Supp. 763, 768 (E.D.Mich.1997) (emphasis in original). Whether a drug sniff can be conducted without reasonable suspicion is therefore largely a question of timing.

In this case, Officer Murphy's testimony indicates, and the government acknowledges, that Officer Murphy's radio check was completed *before* he ordered the drug sniff by the narcotics dog. (See Government's Proposed Findings of Fact and Conclusions of Law 11–14, filed May 30, 2001). Officer Murphy testified that upon speaking with the defendant he did not suspect that the defendant had been drinking, and there is no indication that the officer intended to make an arrest or issue a traffic citation after receiving the response to the license check; at any rate, none was issued. The Court can only conclude, therefore, that any legitimate purpose of the initial traffic stop was completed when Officer Murphy received the negative response to the radio license check.

▉ Once the purposes of the initial traffic stop are completed, an officer may not continue to detain a vehicle or its driver in the absence of reasonable suspicion of criminal activity warranting further

investigation. *United States v. Mesa,* 62 F.3d 159, 162 (6th Cir.1995). Although courts in other circuits have concluded that suspicionless exterior canine sniffs are constitutionally permissible when they occur within very few minutes of the conclusion of a traffic stop, *see United States v. $404,905.00 in U.S. Currency,* 182 F.3d 643 (8th Cir.1999), the United States Court of Appeals for the Sixth Circuit has held that such continued detention is only lawful where "something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." *Mesa* at 162.

▉ Reasonable suspicion must be supported by specific, articulable facts, and the Court considers the totality of the circumstances in determining whether reasonable suspicion exists. *United States v. Erwin,* 155 F.3d 818, 822 (6th Cir.1998); *Palomino* at 449. In this case the only suspicious post-stop fact cited by the government is that the defendant appeared overly nervous in comparison with the individuals involved in Officer Murphy's other traffic stops.[2] The defendant indicated at the time of the stop that he had been working in Nashville all day, and that he was tired and trying to get home. At least in the context of this case, the defendant's nervousness alone is not sufficient to give rise to reasonable suspicion justifying additional detention for the drug sniff. *See Palomino* at 450 ("nervousness alone is not a sufficient ground upon which to base a finding of reasonable suspicion") (construing *Mesa* at 162–163 (noting that "nervousness is generally included as one of several grounds for finding reasonable sus-

---

**2.** Information in the tip from the drug task force agent was admitted at the hearing for the limited purpose of explaining Officer Murphy's actions, not for its truth. There is no evidence in the record detailing the information provided, its original source, or reliability of the information, which would be required

to establish reasonable suspicion on the basis of that information. *See United States v. Payne,* 181 F.3d 781, 790 (6th Cir.1999). The Government's Proposed Findings of Fact, unsupported by any proof, do not constitute evidence.

picion and not a ground sufficient in and of itself," but not ruling out the possibility that in some circumstance nervousness might support reasonable suspicion)).

The Court concludes that because the purposes of the initial stop were concluded, and the officers lacked any reasonable suspicion of criminal activity at the time of the drug sniff, the defendant's continued detention and drug sniff were unreasonable for the purposes of the Fourth Amendment. "When a canine narcotics sniff is performed as the result of the exploitation of [an illegal detention], the fruits of that canine sniff must be suppressed." *United States v. Buchanon,* 72 F.3d 1217, 1226 (6th Cir.1995). Accordingly, the search that occurred as a result of the unlawful drug sniff, and produced the evidence at issue, was also unreasonable.

### ii. Consent

Where the prosecution relies on the consent of the defendant to justify a search, it bears the burden of proving by clear and convincing evidence that the consent was given freely and voluntarily. *Schneckloth* at 222, 93 S.Ct. 2041; *United States v. French,* 974 F.2d 687, 693 (6th Cir.1992). Voluntariness of a consent to search is determined by the Court, based upon the totality of the circumstances. *Schneckloth* at 248–49, 93 S.Ct. 2041; *United States v. Scott,* 578 F.2d 1186, 1189 (6th Cir.1978), *cert. denied,* 439 U.S. 870, 99 S.Ct. 201, 58 L.Ed.2d 182 (1978).

In examining a consent, the Court must consider factors including "the age, intelligence, and education of the individual; whether the individual understands the right to refuse consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." *United States v. Riascos–Suarez,* 73 F.3d 616, 625 (6th Cir. 1996). On the evidence before it, the Court finds nothing with respect to the defendant's characteristics or the length of his detention that would render his consent invalid. However, the Court must also consider the lawfulness of his detention, and whether the defendant understood his constitutional rights and his right to refuse consent.

While a person's knowledge of the right to refuse consent is not an absolute prerequisite to establishing a voluntary consent, *Schneckloth* at 249, 93 S.Ct. 2041, consent is not voluntary when it is merely an acquiescence to a claim of lawful authority. *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). As the Sixth Circuit has held, the prosecution must prove that the defendant's statement "was an unequivocal statement of free and voluntary consent, not merely a response conveying an expression of futility in resistance to authority or acquiescing in the officers' request." *United States v. Worley,* 193 F.3d 380, 386 (6th Cir.1999).

In this case it is undisputed that when first asked for consent to search his vehicle, the defendant refused. Had he consented at that time, his consent and the subsequent search would clearly have been valid under *Erwin.* To the contrary, it was only after Officer Murphy indicated to the defendant that he could and would run a narcotics dog around his truck without a warrant—an act which, as discussed above, Officer Murphy no longer had the constitutional authority to do at that point—and then search the truck if the dog alerted, that the defendant responded "go ahead."

The Court does not suggest that the officer's conduct in this case amounted to outright coercion. However, it is apparent that Officer Murphy clearly conveyed to the defendant Murphy's erroneous belief that he had the legal authority to order a drug sniff of the vehicle after the conclu-

sion of the traffic stop, and that he intended to do so. Under these circumstances, the government has not carried its burden of establishing that the defendant's response, "go ahead," particularly following his initial refusal to consent, was anything other than an "expression of futility in resistance to authority." Accordingly, the Court concludes that the defendant's statement did not amount to an unequivocal voluntary consent, and cannot justify either the continued detention for the drug sniff or the search that followed.

■ At the conclusion of a traffic stop, when an individual is constitutionally free to leave, it is generally not a violation of the Fourth Amendment to ask permission to search a vehicle, regardless of whether an officer continues to have a reasonable suspicion of criminal activity. *Erwin*, 155 F.3d at 822–23. The Constitution does not require that the individual in this circumstance be affirmatively informed that he is free to leave before he is asked for consent to search. *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) However, consent is not valid when it is obtained during an unconstitutional seizure of the person. *United States v. Jenkins*, 92 F.3d 430, 436 n. 1 (6th Cir.1996); *see also Mesa* (continued detention without reasonable suspicion after traffic stop rendered drug sniff and search unconstitutional, despite defendant's verbal and written consent obtained during period of unlawful detention).

The Supreme Court has held that "a person has been seized within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). In this case, there is no evidence that the defendant was ever confined in an officer's vehicle or otherwise physically restrained.

However, the fact that three law enforcement officers arrived quickly at the scene of what was purportedly a minor traffic stop could have caused a reasonable person in the defendant's position to feel intimidated or threatened, and is a factor weighing in favor of a finding that the defendant had been seized. *See id.* (listing the threatening presence of several officers among factors to be considered); *Buchanon* at 1224 (swift arrival of four troopers with pursuit lights flashing would cause reasonable person to feel intimidated or threatened). More importantly, the very act of producing a narcotics dog with the obvious and stated intent of conducting a drug sniff is tantamount to a seizure:

> The very act of bringing [the narcotics dog] out to sniff vehicles tells a reasonable person 'we are investigating you for drugs and you may not move [this] vehicle [ ] until we are through.'

*Buchanon*, 72 F.3d at 1225. In the absence of probable cause, or even reasonable suspicion, this seizure at the conclusion of the traffic stop was unlawful.

Because the purported consent by the defendant to the search in this case was obtained during a period of unlawful seizure, and appears to have been simple concession to actions Officer Murphy asserted he had the authority to take, it was not voluntarily and freely given. Accordingly, it cannot justify the otherwise unreasonable search.

## CONCLUSION

Based upon the foregoing, the motion to suppress will be granted.