# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
## OCTOBER 1999 SESSION

## STATE OF TENNESSEE v. DENNIS W. MENZIES

**Direct Appeal from the Circuit Court for Benton County**
**No. 98CR741     Julian P. Guinn, Judge**

---

**No. W1998-00608-CCA-R3-CD - Decided April 20, 2000**

---

Based upon a tip from a confidential informant that the defendant was transporting illegal drugs, law enforcement officers stopped the defendant's vehicle. Following an "alert" by a drug-sniffing dog, officers searched the defendant, his vehicle, and the car hauler he was operating. Cocaine was found both on the defendant's person and in the console of the car he was hauling. After the court overruled the defendant's motion to suppress the search and seizure, he was convicted of possession of cocaine with intent to manufacture, sell, or deliver. He appealed his conviction, asserting that the stop and search were illegal. Based upon our review, we affirm the judgment of the trial court.

**T.R.A.P. 3; Judgment of the Circuit Court is Affirmed**.

JUDGE ALAN E. GLENN delivered the opinion of the court, in which JUDGE NORMA MCGEE OGLE joined, JUDGE JOHN H. PEAY, not participating.

Raymond L. Ivey, Huntingdon, Tennessee, for the appellant, Dennis W. Menzies.

Paul G. Summers, Attorney General and Reporter, R. Stephen Jobe, Assistant Attorney General, G. Robert Radford, District Attorney General, and Beth Boswell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, Dennis W. Menzies, appeals as of right his conviction by a Benton County Circuit Court jury of possession of cocaine with intent to manufacture, sell, or deliver. The charge resulted from a warrantless search and seizure of the defendant's vehicle, the trial court denying the defendant's motion to suppress. The defendant presents two issues for review:

> I.   Whether there was sufficient reasonable suspicion to justify
>      stopping the vehicle driven by the defendant; and

II. Whether the search of defendant's person was valid.

Based on our review of the record, we uphold the trial court's denial of the motion to suppress and affirm the conviction.

## PROCEDURAL BACKGROUND

Both the defendant and a co-defendant, Timothy Harold Peebles, were indicted by the Benton County Grand Jury on a single count of possession of cocaine with intent to manufacture, sell, or deliver. The defendant's motion to suppress evidence of cocaine found on his person and in a wrecked vehicle he was transporting was denied after a hearing. At the conclusion of the trial, the jury found Peebles not guilty but convicted the defendant of possession of cocaine as charged in the indictment. The defendant was sentenced as a Range I standard offender to a term of eight years.[1] Six months of the sentence were ordered to be served in continuous confinement and the remainder on Community Corrections.[2] Notice of appeal was timely filed.

## FACTS

Sheriff Bobby Shannon, a career police officer in Benton County, testified at the suppression hearing that he was involved in a search of an automobile belonging to the defendant and a wrecked vehicle being transported by the defendant at the Birdsong exit off of I-40 in Benton County on December 10, 1997. Sheriff Shannon had received information from an informant that the defendant would be leaving for Nashville that morning with a car hauler, probably with one other occupant; that the defendant would proceed to Nashville to a car auction, Metro Car Sales; and that he would be bringing cocaine back with him. Sheriff Shannon testified further that he knew the informant and that the informant was connected with the drug culture. The informant had given Sheriff Shannon information in the past but not drug-related information. The sheriff also testified that the informant was not seeking any consideration in return for the information concerning the defendant.

On the morning of December 10, Sheriff Shannon and Chief Deputy Chris Rogers went in an unmarked vehicle to the Cuba Landing exit off I-40 to watch for the defendant's car hauler, a vehicle which Sheriff Shannon already knew. Between 7:00 and 8:00 a.m., the vehicle was spotted headed towards Nashville. The Sheriff then returned to meet in McKenzie, Carroll County, Tennessee, with Steve Lee, director of the drug task force for the District Attorney General's Office

---

[1]Defendant was convicted of a Class B felony, not a Class E felony as incorrectly indicated on the judgment form included with this record.

[2]The jury also set the defendant's fine at the maximum of $100,000. We note that the trial court deferred action on defendant's motion to reduce the fine as excessive given the circumstances. We have recognized that an oppressive fine can disrupt future rehabilitation and prevent a defendant from becoming a productive member of society. See State v. Marshall, 870 S.W.2d 532 (Tenn. Crim. App.), perm. app. denied (Tenn. 1993).

for the 24th Judicial Circuit.  Sheriff Shannon testified that Lee told him the informant had also given Lee information in the past and that this information had led to arrests and at least two convictions.  Plans were then put in place to station different officers in vehicles at various points along I-40, starting at the Bucksnort exit and including the Birdsong exit where Sheriff Shannon and Steve Lee were stationed.  The operation involved seven law enforcement officers altogether, including Officer Jacque Bass, a trained canine handler.  The officers were in place at approximately 2:00 p.m.

Officers stationed at the Bucksnort exit first spotted the defendant at approximately 7:20 p.m.  He was heading west on I-40 with a wrecked car on the hauler when he stopped briefly at the Bucksnort exit, as the informant had predicted he would.

Sergeant Donald Wayne Blackwell, an officer with the City of Paris Police Department who was also assigned to the 24th Judicial District Drug Task Force, was the officer who initially stopped the defendant.  Sergeant Blackwell was driving the vehicle that turned on strobe lights, blue lights, and a siren as the defendant's vehicle moved up the exit ramp at the Birdsong exit off of I-40.  Sergeant Blackwell testified to the following sequence of events:

> A. We got out and explained to Mr. Menzies why he was stopped.  They were – Mr. Menzies and Mr. Peebles were frisked, patted down to see if he had any weapons on his person.  He was not searched at that time.  He was explained that we had information that he was supposed to be bringing cocaine back in and was asked if he would give permission to search his vehicle.
>
> Q. Did he give permission to search the vehicle?
>
> A. At first he said he would, and then he hesitated.  And after he hesitated and showed some reluctance in giving consent, at that time Director Lee told Officer Bass to get the canine, brought the canine to do a sniff of the car hauler.
>
> Q. At that point did the canine then sniff the car hauler?
>
> A. Yes, ma'am.
>
> Q. Did you see the dog alert on any areas?
>
> A. Yes, ma'am.
>
> Q. After the dog had alerted what did you do?
>
> A. After I saw two alerts that the dog gave, one of them on the

inside of the cab of the car hauler where Mr. Menzies and Mr. Peebles had been, I felt at that time that I had probable cause to search Mr. Menzies. And I had him to empty his pockets out onto the hood of the Jeep where I was standing with Deputy Stockdale. He emptied his pockets out. And one of the things that was in his pants pockets was a dark blue cigarette lighter that was in with his money. At the bottom of it, it had some black marks on it. It was kind of opaque color. I picked the lighter up, and the lighter didn't work. And when I inspected the bottom of it, it was a false bottom. Opened it up and it was packed with cocaine.

As to the informant, Sheriff Shannon testified at the suppression hearing in the following manner:

Q.   The person you were talking to, did you know whether or not this person knew Mr. Menzies?

A.   Yeah, I did.  I knew that he knew him.

Q.  All right; he knew Mr. Menzies?

A.  Right.

Q.  All right; now, did this person tell you how he knew that they would be making this trip to Nashville?

A.  Yes.

Q.  And what was that?

A.  Because every sale day that Mr. Menzies went up there and bought cars and brought cocaine back.

Q.  All right; this was an every sale day occurrence?

A.  Right.

Q.  And the person that told you this told you he had personal knowledge of this?

A.  Right.

Q.  And so you then determined the next sale date?

A. Yes.

Q. Okay; now, when he mentioned the name of Menzies and Mr. Peebles, but Mr. Menzies in particular, was that a name you were familiar with?

A. It was.

Q. How were you familiar with Mr. Menzies?

A. We'd had him under investigation for selling drugs for at least ten years.

Q. All right; and whether or not that he had sold drugs or was innocent, did you have a strong suspicion he had been selling drugs?

A. Yes, I did.

Q. And had you received other information from this in the past from numerous sources?

A. Numerous sources, yes.

Q. And, in fact, had you tried to catch him?

A. Yes, sir.

Q. Were you ever able to?

A. No.

Steve Lee, Director of the Drug Task Force of the District Attorney General's Office for the 24th Judicial Circuit, testified that he had "worked" the informant previously. The informant had "done some drug cases" that resulted in convictions in Benton County. Lee testified further that he and Sheriff Shannon had personally interviewed the informant on the day of the defendant's arrest. Lee testified that "[a]fter interviewing him and with the past history that I'd had with him before, I felt like he was telling us the truth."

On cross-examination, Lee responded in the following exchange concerning the informant:

Q. Did the informant tell you how he knew that on this date, I believe December the 10th, is that right?

A. Yes, sir.

Q. Of 1997, that Mr. Menzies would be going to Nashville to a car auction to bring back cocaine?

A. He had been with him when this had taken place before, several times.

Q. How long ago before December 10th?

A. He had been with him like the week before.

Q. The week before. And based on that, he knew that Mr. Menzies would be bringing back on the day that you arrested him?

A. That, and he had talked to him prior to that and knew he was going back again.

Q. Going back to an auction or going back for cocaine?

A. Going back to an auction and picking up cocaine.

. . . .

Q. Well, you stated that the informant had talked to Mr. Menzies?

A. Yes, sir.

Q. All right; a couple of days before Mr. Menzies was arrested?

A. Right.

Q. And, allegedly, Mr. Menzies told him this. Is that what you were told?

A. Yes, sir.

In denying the motion to suppress, the trial court noted that the issue was essentially a "warrantless search based upon information of a confidential informant." The trial court ruled as follows:

And this Court finds that there was reasonably trustworthy

-6-

information that a crime had been committed and specifically identified the property, that is the controlled substance, that was subject to seizure. The Court further finds that the informant had a basis for that information, that the credibility of the informant was properly established and that the exigencies of the situation were such that a warrantless search was indeed justified in this instance.

At the trial, Director Lee gave the following testimony, adding new details concerning the informant:

> Q. What information did you receive from the informant on December 10th?
>
> A. He went into detail about what time Mr. Menzies would leave, what he would be driving, which was a truck, what we call a rollback, that he would go to Nashville to the car auction and that he would bring back cocaine, and it would be in two Bic lighters, that he would stop at Bucksnort to get beer, and he would come back the Birdsong exit.

Lee was asked on cross-examination, "[A]re you fabricating just to get the confidential informant in?" He responded, "No, sir."

At the hearing on the motion for a new trial, the defendant argued that, even though Sheriff Shannon and Director Lee met with the informant together, Sheriff Shannon could not testify as to a definite time when the informant had been with the defendant while Lee seemed able to add increasing detail each time he testified. The defendant claims that such discrepancies undermine any police corroboration of the informant and therefore "the stop was bad" because it was unsupported by articulable reasons to stop him. The trial court noted:

> I recall we wrestled with this question on at least one prior occasion, and the Court then found that there was reasonably trustworthy information that the crime had been and was being committed, that the officers had basis for their information, that there was established the credibility of the informant and the exigent circumstances, that is the vehicle on the open highway, was certainly sufficient to warrant the warrantless search at that time. There were troubling differences between the testimony of the two witnesses. I think there was perhaps some explanation of those differences. But I'm of the opinion that the information was indeed received and that the information was within itself sufficient.

**ANALYSIS**

The standard which we apply in reviewing the trial court's ruling on the defendant's motion to suppress was explained in State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998):

> When reviewing a trial court's ruling on a motion to suppress, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn.1996). We afford to the party prevailing in the trial court the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence. The findings of a trial court in a suppression hearing will be upheld unless the evidence preponderates against those findings. *Id*. The application of the law to the facts found by the trial court, however, is a question of law which this Court reviews *de novo*. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn.1997).

Thus, in making our analysis, we will uphold the trial court's factual analysis, unless the evidence preponderates against it, and will review *de novo* the application of the law to the facts.

## A. Grounds for Permissible Stop

The issue of the officers' right to stop the defendant must be resolved before any other questions are reached. It is well-settled law that a police officer may make an investigatory stop when the officer has a reasonable suspicion that "criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968); see also State v. Bridges, 963 S.W.2d 487, 492 (Tenn. 1997). In justifying the intrusion, the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21, 88 S.Ct. at 1880. Additionally, we must consider the "automobile exception" to warrant requirements, as set out in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), as explained in Wyoming v. Houghton, 526 U.S. 295, 300, 119 S.Ct. 1297, 1300, 143 L.Ed.2d 408 (1999):

> Thus, the Court [in Carroll] held that "contraband goods concealed and illegally transported in an automobile or other vehicle may be searched for without a warrant" where probable cause exists.

In State v. Pully, 863 S.W.2d 29 (Tenn. 1993), our supreme court explained the manner in which the tip of an informant, upon which an investigatory stop is made, must be measured:

> When a stop is based on the tip of an informant, however, the danger of false reports, through police fabrication or from vindictive or unreliable informants, becomes a concern. Thus, both state and federal courts have developed tests for determining the reliability of

informants' tips. In the context of "probable cause" determinations, Tennessee law requires a showing of both the informant's credibility and his or her basis of knowledge. *See State v. Jacumin*, 778 S.W.2d 430, 436 (Tenn.1989). The Court in *Jacumin* held that

> while independent police corroboration could make up deficiencies in either prong, each prong represents an independently important consideration that 'must be separately considered and satisfied in some way.'

Id. at 31 (footnote omitted) (quoting State v. Jacumin, 778 S.W.2d 430, 436 (Tenn. 1989)). The court then noted the difference between "probable cause" and "reasonable suspicion":

> Although the *Jacumin* factors are helpful in determining not only whether "probable cause" exists, but whether "specific and articulable facts" justify a stop,
>
> > [r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Id. at 32 (quoting Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990)).

With these guides in mind, we turn to the "stop" of the defendant to determine if the police officers had sufficient reasonable suspicion to carry out a permissible seizure of the defendant.[3]

At the suppression hearing, Sheriff Shannon testified that the surveillance and stop of the defendant were prompted by information from a single informant who told both Sheriff Shannon and Director Lee of the approximate time the defendant would be leaving on December 10; the fact that Peebles would probably accompany the defendant; that the defendant would stop at the Bucksnort exit on the way back to Benton County; and that the defendant would take the Birdsong exit to return to Benton County. Sheriff Shannon testified further that the defendant had been under investigation for some ten years for suspected drug dealings and that in the past "numerous sources" had told him the defendant was selling drugs, such information being in the category of "casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." Spinelli v.

---

[3]From the moment that Sergeant Blackwell turned on his blue lights and brought the defendant to a full stop, the defendant was "seized" within the meaning of Terry.

United States, 393 U.S. 410, 416, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1969). Here the legality of the stop hinges primarily on whether the informant's tip meets the two-prong Jacumin test.

Under the first or "basis of knowledge" prong of the test, facts must be sufficient to determine "whether the informant had a basis for his information that a certain person had been, was or would be involved in criminal conduct or that evidence of crime would be found at a certain place." State v. Moon, 841 S.W.2d 336, 338 (Tenn. Crim. App. 1992) (citing Wayne R. LaFave, 1 Search and Seizure, § 3.3(a) (2d ed. 1978)). Here, both Sheriff Shannon and Director Lee personally knew the confidential informant, knew that he was connected with the drug culture, and that he was acquainted with the defendant. At the suppression hearing, Sheriff Shannon responded on cross-examination to the question, "You don't know how the confidential informant came by any information given you, do you?" by answering, "No, I don't." But later on redirect examination, Sheriff Shannon stated that the informant had personal knowledge of the trips the defendant took to purchase cars and cocaine. Director Lee, on the other hand, was quite specific in his testimony concerning the basis of knowledge of the informant, which was that the informant had been with the defendant "numerous other times when he picked up cocaine" and had talked to him and knew that he was going to an auction to pick up cocaine on December 10. Director Lee testified that everything learned from the informant was learned during the interview that he and Sheriff Shannon conducted together. While there is a difference in the two officers' testimony, it is clear from Sheriff Shannon's statement on redirect that he considered the informant as having personal knowledge of the defendant's drug activities. In State v. Marshall, 870 S.W.2d 532, 539 (Tenn. Crim. App.), perm. app. denied (Tenn. 1993), this court held that when the informant advised the officer that his information was based upon personal observation, the police were "sufficiently advised of his basis of knowledge." A common sense approach leads us to conclude that the confidential informant in this case had firsthand knowledge of the dual purpose of the defendant's trips to the auction in Nashville, and, therefore, the basis of knowledge prong of the test was satisfied without the need to find corroboration from the defendant's activities observed by officers on December 10.

Under the second "credibility" prong, facts must be revealed that show either the inherent credibility of the informant or the reliability of his information on the particular occasion. See Moon, 841 S.W.2d at 338. It is generally true that the credibility of an informant is shown by his having given information in the past to law enforcement officers that has proven reliable; that is, the informant has a proven "track record." See id. at 339. In State v. Bridges, 963 S.W.2d 487, 491 (Tenn. 1997), our supreme court held the following:

> In the present case the informant who provided the tip about the defendant's criminal activity had assisted Officer Blackwell on a case approximately eight years earlier in which an arrest and conviction were made on a cocaine charge. Blackwell had known this informant for a number of years and said this informant had "always been very straightforward and very honest and very reliable" with him. These facts minimally satisfy the credibility prong of the Jacumin test.

In this case, the second prong of the test was satisfied because the informant had given information

-10-

to Director Lee in the past that led to two convictions of other drug dealers in Benton County.[4]

As further corroboration of the informant's information, Sheriff Shannon had suspected the defendant for approximately ten years of drug dealings and he and other officers observed the defendant's travel to and return from Nashville, as the informant had advised would occur. See State v. Kelly, 948 S.W.2d 757, 762 (Tenn. Crim. App. 1996). Kelly distinguishes State v. Coleman, 791 S.W.2d 504 (Tenn. Crim. App. 1989), perm. app. denied (Tenn. 1990), because in Kelly, as in the instant case, officers had background information about the defendant as well as corroborating the information from the informant. While the informants in both Kelly and Coleman were anonymous, the informant in the instant case had established reliability based upon previous information provided.

The defendant has accurately described the trial court's comparison of the testimony of Sheriff Shannon and that of Steve Lee, Director of the 24th Judicial District Drug Task Force:

> There were troubling differences between the testimony of the two witnesses. I think there was perhaps some explanation of those differences. But I'm of the opinion that the information was indeed received and that the information was within itself sufficient.

Since "resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact," Odom, 928 S.W.2d at 23, this court cannot assess the credibility of the State's witnesses.

Accordingly, considering the confidential informant's demonstrated basis of knowledge and credibility under the two-pronged test of reliability, we conclude that the informant's tip provided "specific and articulable facts" sufficient to support a finding of reasonable suspicion justifying the

---

[4]Our supreme court has concluded that "the gravity of the perceived harm is a crucial element in assessing the reasonableness of an investigative Terry stop." State v. Pully, 863 S.W.2d 29, 33 (Tenn. 1993). The defendant in this case argues that this was not a situation of imminent danger with weapons involved. Justice Powell, in a concurring opinion in United States v. Mendenhall, 446 U.S. 544, 561, 100 S.Ct. 1870, 1881, 64 L.Ed.2d 497 (1980), noted that "[t]he reasonableness of a stop turns on the facts and circumstances of each case. In particular, the Court has emphasized (i) the public interest served by the seizure, (ii) the nature and scope of the intrusion, and (iii) the objective facts upon which the law enforcement officer relied in light of his knowledge and expertise." In this case, the initial stop was a typical "pull-over" with lights flashing. As for the public interest, it is surely served when the sale and use of illegal drugs are curtailed. See State v. Kelly, 948 S.W.2d 757, 762 (Tenn. Crim. App. 1996) ("the public interest served was the interdiction of a drug sale").

investigatory stop under <u>Terry</u>.[5]

## B. Search Incident to Arrest

The defendant next contends that in the absence of an arrest, the officers had no basis to engage in a search of the defendant's person. Specifically, the defendant contends that the search—that is, the ordering of the defendant to empty his pockets after the drug dog alerted on the vehicle—could not have been incident to arrest because Officer Blackwell testified that he had not formally placed the defendant under arrest when he ordered him to empty his pockets. The defendant relies on <u>Chimel v. California</u>, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) to support his argument that to compel a full search, the suspect must be in custodial arrest.

Our supreme court has noted that the "fundamental principle of search and seizure jurisprudence is that the police may not conduct a search unless they first show probable cause and obtain a warrant from a neutral magistrate." <u>State v. Crutcher</u>, 989 S.W.2d 295, 299 (Tenn. 1999). A warrantless search or seizure is, therefore, presumed to be unreasonable and in violation of both the federal and state constitutions. Evidence discovered as a result of a warrantless search is subject to suppression, unless the State is able to demonstrate that the search or seizure was carried out pursuant to one of the narrowly defined exceptions to the requirement that the police first obtain a warrant. <u>See</u> <u>State v. Bridges</u>, 963 S.W.2d 487, 490 (Tenn. 1997) (citing <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 454-55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971)). A warrantless search incident to a lawful arrest is one of those narrowly defined exceptions. <u>See</u> <u>State v. Watkins</u>, 827 S.W.2d 293, 295-96 (Tenn. 1992) (citing <u>New York v. Belton</u>, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981) (holding that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile"). Police are permitted to search the body of the person arrested and the immediately surrounding area. <u>See</u> <u>Chimel</u>, 395 U.S. at 763, 89 S.Ct. at 2040. Ample justification for such searches and seizures is found in the dual purposes of removing any weapons that might be used to resist arrest or effect escape, and of preventing the concealment or destruction of any evidence on the arrestee's person. <u>See</u> <u>id</u>. We, therefore, first determine whether the defendant was under lawful custodial arrest when Officer Blackwell conducted the search of his person by requiring him to place all the items in his pockets on the hood of one of the police vehicles.

A lawful custodial arrest is justified upon a showing of probable cause to believe that a crime has been committed and that the suspect of the investigation committed that crime. <u>See</u> Tenn. Code

---

[5]This case is distinguishable from <u>United States v. Buchanon</u>, 72 F.3d 1217 (6th Cir. 1995), in which officers encountered defendants, whose truck had broken down on the highway and found cocaine in the vehicle after utilizing a drug-sniffing dog. Here, officers had reasonable suspicion to stop the defendant's vehicle. The court in <u>Buchanon</u> concluded that "the troopers did not have reasonable and articulable suspicion for seizing the defendants, and the truck, for a limited investigatory purpose." 72 F.3d at 1226.

Ann. § 40-7-103(a)(4) (Supp. 1999) ("An officer may, without a warrant, arrest a person: . . .(4) On a charge made, upon reasonable cause, of the commission of a felony by the person arrested[.]"). Probable cause has been construed by our supreme court as existing "if the facts and circumstances within the officer's knowledge at the time of the arrest, and of which the officer 'had reasonably trustworthy information sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" State v. Henning, 975 S.W.2d 290, 300 (Tenn. 1998) (quoting Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)). As determined above, the confidential informants's tip was reliable, reasonably trustworthy information, and a certified drug-sniffing dog, handled by a trained officer, alerted on the vehicle being transported on the defendant's car hauler where, upon searching the vehicle, illegal drugs were found concealed in the false bottom of a lighter.

The law is well settled that probable cause to search is established by an "alert" from a drug-sniffing dog. Romo v. Champion, 46 F.3d 1013, 1020 (10th Cir. 1995) ("a dog alert without more [creates] probable cause for searches and seizures"); Hearn v. Board of Pub. Educ., 191 F.3d 1329, 1333 (11th Cir. 1999) (search of vehicle did not violate the Fourth Amendment because "[i]t was based upon the probable cause generated by the dog sniff, and justified by the automobile exception to the general requirement for a warrant"); Harrison v. State, 7 S.W.3d 309, 311 (Tex. Ct. App. 1999) ("when a trained and certified narcotics dog alerts an officer to apparent evidence or contraband, probable cause exists to search a vehicle"); State v. Braendle, ____ P.2d ____ (Idaho Ct. App. 2000) ("The reaction of the drug detection dog provided the probable cause to justify the search.").

Thus, we find that the officers had probable cause for a warrantless arrest.

Having determined that a warrantless arrest was permissible under the circumstances of this case, we still must determine if an arrest was in fact made. In Tennessee, an arrest is defined as the "taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act with indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest." West v. State, 425 S.W.2d 602, 605 (Tenn. 1968) (citations omitted). Here, Officer Blackwell testified to the following:

> Q. Once you saw what was in the lighter in Exhibit Number 2 [the lighter from the defendant's pocket], what did you do with that?
>
> A. I kept possession of it at that time. I put some flex cuffs on Mr. Menzies. He was placed in the back seat of the Jeep Cherokee. And then we called for a marked patrol unit to transport him. And I advised him of his rights. Then I went over to where Rick Gallimore was searching the car that was on the back of the car hauler.

Based upon the evidence presented, we conclude that the defendant was under lawful custodial arrest

and that the search of his person was permissible.[6]

## CONCLUSION

Accordingly, because both the stop and search of the defendant were constitutionally valid, we hold that the trial court correctly overruled the defendant's motion to suppress the evidence obtained in the search. Therefore, we affirm the conviction.

Judge Alan E. Glenn
Judge John H. Peay (Not Participating)
Judge Norma McGee Ogle

---

[6]The defendant argues that the order of events made the search of his person unlawful because he was not placed under arrest until after he had been ordered to empty his pockets and the cocaine had been found in the false bottom of the lighter. We find that the search in this case, though prior to arrest, was part of the same "transaction" and is therefore valid under the holding of the United States Supreme Court in Rawlings v. Kentucky, 448 U.S. 98, 111, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633 (1980) ("Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa."). See also Warden v. State, 379 S.W.2d 788, 791 (Tenn. 1964) (holding that a search incident to arrest will be upheld "even though the search actually precedes the arrest, if the two may be regarded as part of one and the same transaction").