**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael Leo WHITESIDE,
Defendant–Appellant.**

No. 00–5811.

United States Court of Appeals,
Sixth Circuit.

Oct. 18, 2001.

Before KEITH, SUHRHEINRICH, and CLAY, Circuit Judges.

CLAY, Circuit Judge.

Defendant, Michael Leo Whiteside, appeals from the judgment of conviction and sentence entered by the district court on June 6, 2000, following Defendant's guilty plea conviction for one count of possessing with the intent to distribute crack cocaine in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(B), for which he was sentenced to 60 months' imprisonment.

On appeal, Defendant challenges the district court's denial of his motion to suppress the evidence seized from Defendant's person in the course of a stop for a traffic infraction and subsequent pat down search. For the reasons set forth below, we **AFFIRM** Defendant's judgment of conviction.

## STATEMENT OF FACTS

Defendant was indicted by a federal grand jury on July 7, 1999, on one count of possession with intent to distribute cocaine base ("crack") in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) following his arrest on June 21, 1999 by the Knoxville, Tennessee police. On September 13, 1999, Defendant filed a motion to suppress evidence seized by the arresting officers as well as statements made by Defendant to the officers following his arrest. Defendant based his motion on the contention that the police officers lacked probable cause to initially stop Defendant's vehicle, thus rendering the resulting search and arrest illegal and the contraband and statements fruits of a poisonous tree.

A suppression hearing was held on September 23, 1999, and the magistrate thereafter issued a report and recommendation to the district court that Defendant's motion should be denied on the basis that the police officers had probable cause to make the initial stop. Defendant filed an objection to the report and recommendation, and the government responded. On October 25, 1999, the district court entered a memorandum and order overruling Defendant's objection, and denying Defendant's motion to the motion to suppress the evidence.

Defendant then entered into a Rule 11 plea agreement with the government, preserving his right to appeal the district court's denial of his motion to suppress the evidence. Defendant's plea was accepted and the district court thereafter sentenced Defendant to sixty months' imprisonment to be followed by four years of supervised release. This timely appeal ensued.

### Facts

In June of 1999, Knoxville Police Officers John R. Kiely and Scott Gilbert stopped a car driven by Defendant in an area known as the Ridgebook housing and development which, according to Officer Kiely, is an area known for "high drug" use. Officer Kiely testified that he stopped Defendant's vehicle, a light blue older model Cadillac, because the vehicle had a "busted windshield." According to Officer Kiely, the "busted windshield" made the vehicle unsafe and obstructed the driver's vision and/or operation of the vehicle. Kiely "checked Mr. Whiteside's license to see if it was valid," and issued Defendant a verbal warning that he would give Defendant a citation if the windshield went unrepaired. Defendant agreed to have the windshield repaired and Officer Kiely and Defendant both departed.

The next day, on June 21, 1999, at about 12:15 p.m., Officers Kiely and Gilbert were in the same area and once again saw Defendant's vehicle and the windshield had not yet been repaired. The officers stopped Defendant and, upon doing so, Officer Kiely reminded Defendant that he had warned Defendant about having the windshield repaired. Kiely testified that he and Defendant engaged in conversation "for a second," and that Kiely then asked Defendant if he had "any guns, knives, or hand grenades in the vehicle," as, according to Officer Kiely, he "normally" did "just for the officer's safety because you never know." Kiely claimed that Defendant responded, "no, Officer Kiely. Go ahead and look. And he stepped out of the car and pulled his shirt up . . . ."

Officer Kiely went on to testify that he then went back to his patrol car to "run his tag real quick through records just to make sure everything was good. I ran his ID to make sure he's not wanted an make sure the vehicle is not stolen." According to Kiely, as he was doing so, Officer Gilbert "was going to pat [Defendant] down for officer safety before he checked the vehicle. That's pretty standard of what

we do just to make sure nobody has any kind of weapon whatsoever." (J.A. at 58.) Kiely then testified that he

> was watching him [Officer Gilbert] as I run the vehicle. For officer safety, I watched my partner, and I seen my partner, he was patting down his [Defendant's body]. When my partner gets to his pocket, Mr. Whiteside grabbed my partner's hand. At that point, we handcuffed him. And my partner told me later that the reason he [Defendant] grabbed his hand was that my partner felt a bulge in his pocket and he grabbed his hand.

> Q [the prosecutor] But for whatever he felt, ultimately, you all pulled something out of his pocket; is that right?

> A [Officer Kiely] Yes, sir.

> Q [the prosecutor] And what was that?

> A [Officer Kiely] It was a bag of crack cocaine.

> Q [the prosecutor] What happened then after that was discovered?

> A [Officer Kiely] We placed Mr. Whiteside under arrest, handcuffed him, and placed him in the vehicle [patrol car].

(J.A. at 59.) Officer Kiely also stated that Defendant yelled out to some of the people who had gathered, asking if one of them would call his girlfriend because he had been caught with "some rock." (J.A. at 59–60.) Officer Kiely admitted that Defendant had not been advised of his rights at that time, but claimed that "there was no reason" for Kiely to do so inasmuch as Kiely "wasn't interrogating him. He was talking to the people. He wasn't talking to me." (J.A. at 60.)

However, Officer Kiely also admitted to having a "conversation" with Defendant after Kiely and Gilbert moved Defendant to the next building in the housing complex because of the crowd of people that had formed. Specifically, when asked if he engaged in a "general conversation" with Defendant after moving him to the new location, Kiely replied:

> Yeah. You know, I was going over the arrest report, asking him his name and all that stuff, and Mr. Whiteside seemed like a bright guy which kind of—you know, I was talking to him. I asked him, have you ever been to school? He said, yes, he had been to college and he had a degree. And I said, so why are you doing this? Why are you selling crack? And he said, well, there's more money in it.

(J.A. at 61.) Officer Kiely claimed that he "wasn't trying to interrogate him [Defendant]. [Kiely] was just talking to him on a personal level, ... trying to feel him out, wondering why he had crack cocaine on him." (J.A. at 61.)

Officer Gilbert's rendition of the events was that "[f]or officer safety issue," he patted Defendant down after Defendant consented to allowing the officers to look in the car, and upon patting Defendant down, Officer Gilbert felt "a large lump of small rocks which [he] believed to be drugs." Officer Gilbert based his belief that the lump of small rocks were drugs "[t]hrough [his] experience in the area that he was in," meaning "Ridgebrook is an area known for high drug sales[,]" as well as from his training at the police academy. (J.A. at 81–82.) Officer Gilbert went on to testify that upon feeling the lump, Defendant "immediately started yelling, you're violating me. Leave me alone." (J.A. at 82.) According to Officer Gilbert, he then told Defendant to calm down because Gilbert "already knew what it was, and [Gilbert] went ahead and cuffed him." (J.A. at 83.)

Like Officer Kiely, Officer Gilbert stated that Defendant yelled out to a bystander that he had been caught with "some rock."

(J.A. at 83.) Gilbert added that while he was filling out Defendant's paperwork, Defendant asked Gilbert if he had "weighed it," to which Gilbert responded, "what," to which Defendant in turn allegedly replied, "the crack." (J.A. at 83.) Gilbert then informed Defendant that he had not weighed it.

Officer Gilbert wrote the citation charging Defendant with "vision being obstructed due to the large crack in the windshield." (J.A. at 84.) However, since that time Officer Gilbert learned that he charged Defendant under the wrong city ordinance—i .e., although the wrong ordinance was cited, an ordinance does exist making it unlawful to drive a vehicle in unsafe condition.

## DISCUSSION

This Court reviews a district court's decision on a motion to suppress the evidence under " 'two complimentary standards. First, the district court's findings of fact are upheld unless clearly erroneous. Second, the court's legal conclusion as to the existence of probable cause is reviewed *de novo.*' " *United States v. Diaz,* 25 F.3d 392, 394 (6th Cir.1994) (quoting *United States v. Leake,* 998 F.2d 1359, 1362 (6th Cir.1993) (citations omitted)). In reviewing the district court's findings of fact, we consider evidence in the light most favorable to the government. *United States v. Buchanon,* 72 F.3d 1217, 1723 (6th Cir. 1995). In addition, we must give deference to the district court's assessment of credibility inasmuch as the court was in the best position to make such a determination. *See United States v. Bradshaw,* 102 F.3d 204, 210 (6th Cir.1996).

In *United States v. Hill,* 195 F.3d 258, 263–64 (6th Cir.1999), this Court summarized the law attendant to traffic stops as follows:

Recently, in *Knowles v. Iowa,* 525 U.S. 113, 119 S.Ct. 484, 488, 142 L.Ed.2d 492 (1998), a unanimous Supreme Court held that a full-blown search of an automobile and its driver, after an officer had elected to issue the driver a traffic citation rather than arresting the driver, violated the Fourth Amendment. Because neither the officer's safety nor the need to preserve evidence was implicated by the routine traffic stop, the Court held that once the driver was stopped for speeding and was issued a citation, all of the evidence necessary to prosecute him had been obtained and, without a reasonable suspicion that other criminal activity was afoot, the stop of the vehicle and issuance of a traffic citation did not justify a full search of the vehicle. *Id.* However, the *Knowles* decision does not change the fact that an officer may detain an individual after a routine traffic stop is completed if the officer has a reasonable suspicion that the individual is engaged in criminal activity. *See [United States v.] Erwin,* 155 F.3d [818], 822 [ (6th Cir.1998) ]. Furthermore, *Knowles* does nothing to the state of the well-settled law that the legality of the traffic stop is not dependent upon an officer's motivations. *See Whren v. United States,* 517 U.S. 806, 812–13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *United States v. Ferguson,* 8 F.3d 385, 391 (6th Cir.1993) (*en banc* ), *cert. denied,* 513 U.S. 828, 115 S.Ct. 97, 130 L.Ed.2d 47 (1994). That is to say, an officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, even when the officer lacks the requisite reasonable suspicion to do so initially—i.e., when the traffic stop is pretextual, as long as the officer had probable cause to initially stop the vehicle. *Whren,* 517 U.S. at 812–13, 116 S.Ct. 1769. If the initial traffic stop is illegal or the detention exceeds its prop-

er investigative scope, the seized items must be excluded under the "fruits of the poisonous tree doctrine." *See Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The touchstone of the Fourth Amendment is "reasonableness" based upon the totality of the circumstances. *Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (citing *Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)).

## A. The Initial Traffic Stop

Defendant argues that Officers Kiely and Gilbert lacked probable cause to stop Defendant because he had not violated the city ordinance for which the traffic ticket was issued. Defendant contends that the officers based their probable cause to stop Defendant on an alleged violation of Knoxville City Ordinance 17–385, entitled "Obstruction of windshield; windshield wipers." This ordinance provides:

(a) No person shall drive any motor vehicle with any sign, poster or other non-transparent material upon the front windshield, side wings or side or rear windows of such vehicle which materially obstructs, obscures or impairs the driver's clear view of the highway or any intersecting highway.

(b) Every motor vehicle equipped with a windshield shall be equipped with a device for cleaning rain, snow or other moisture from the windshield, which shall be so constructed as to be controlled or operated by the driver of the vehicle.

(c) Every windshield wiper upon a motor vehicle shall be maintained in good working order.

KNOXVILLE, TENN., CODE OF ORDINANCES part II, ch. 17, art. VII, div. 1, § 17–385 (2000). Defendant goes on to argue that because it has been conceded this ordi-

nance did not apply to Defendant, it is clear that the stop was improper. We disagree.

Defendant's claim does not mesh with the officers testimony at the suppression hearing to the effect that they stopped Defendant on the day in question, as well as on the previous day when they issued the warning, because they believed that Defendant's cracked windshield posed a safety threat to himself and other drivers in violation of Knoxville city ordinance. True enough, the officers issued the citation which resulted from the stop under the wrong ordinance; however, the fact remains that a Knoxville city ordinance does exist which makes it a misdemeanor for "any person to drive or move or for the owner to cause or knowingly permit to be driven or moved on any highway any vehicle or combination of vehicles which is in unsafe condition as to endanger any person ...." *See* KNOXVILLE, TENN., CODE OF ORDINANCES part II, ch. 17, art. VII, div. 1, § 17–376 (2000).

The case law makes clear that if the officers had probable cause to stop the vehicle, the fact that they issued the citation to Defendant under the wrong city ordinance is of no moment to the validity of the stop. *See, e.g., United States v. Stone,* 954 F.2d 1187, 1191 (6th Cir.1992) (noting that "[t]he Supreme Court and this court have consistently held that even an erroneous statutory citation in an indictment does not thereby render the ensuing conviction under the correct statute invalid"); *United States v. Fossler,* 597 F.2d 478, 482 (5th Cir.1979) (recognizing that "where a defendant was arrested for the 'wrong' offense, the arrest was nonetheless valid where the crime for which he was arrested and the crime for which there was probable cause to believe he had committed are closely related").

■ Accordingly, the issue becomes whether the record supports a finding that the officers had probable cause to stop Defendant for violating the Knoxville ordinance making it a misdemeanor to operate a motor vehicle in unsafe condition. At the suppression hearing Defendant provided photographs of his vehicle bearing the cracked windshield, and argued as he does now that because Defendant's view was not obstructed by the cracks, the officers could not have had probable cause to believe that he was operating the car in an unsafe condition. Once again, we disagree.

Probable cause to make a stop has been defined as "reasonable ground for a belief, more than a mere suspicion but less than a prima facie case." *See United States v. Ferguson,* 8 F.3d 385, 392 (6th Cir.1993). The existence of probable cause is determined by the totality of the circumstances. *See United States v. Barrett,* 890 F.2d 855, 861 (6th Cir.1989). In making credibility determinations as to an officer's purported reason for initially stopping a vehicle, the Court may use the record in the case before it, what has been learned from other similar cases, all reasonable inferences drawn therefrom, as well as its own common sense. *See Hill,* 195 F.3d at 266.

While it is true that the photographs of Defendant's vehicle indicate that the cracks in the windshield were not directly in front of the driver's side of the windshield, but were more centrally located in the windshield, the fact remains that the photographs do support the officers' contention that the windshield was badly cracked. A common sense understanding of cracks in a windshield is such that they usually branch off in several directions over a period of time, and that the cracks themselves lessen the strength of the windshield. In addition, common sense also tells us that a driver does not simply use the portion of the windshield in front of him when driving, but rather uses all of the windshield at various times for a complete view of the road and surrounding area. As a result, cracks of the type in Defendant's windshield may have from time to time impeded his view whenever it was necessary to view things in the periphery. We therefore find the officers' testimony as to their belief for stopping Defendant's vehicle was credible. *See Hill,* 195 F.3d at 266.

Accordingly, we conclude that the officers had reasonable grounds—and thus probable cause—for believing that Defendant was operating his vehicle in an unsafe condition when stopped, and the district court's finding in this regard was not clearly erroneous. *See United States v. Johnson,* 242 F.3d 707, 709 (6th Cir.2001) (finding that the defendant's operation of his vehicle with a broken taillight was sufficient to provide the officer with probable cause to believe that the defendant was not operating the vehicle "in good condition" in violation of Tennessee law); *Hill,* 195 F.3d at 267; *compare United States v. Freeman,* 209 F.3d 464, 466 (6th Cir.2000) (holding that Shelby County, Tennessee drug interdiction Officer David Tate lacked probable cause to stop "a large motor home partially weaving into the emergency lane for a few feet and an instant in time" on the basis that the vehicle was not being driven "within a single lane 'as nearly as practicable' " under Tennessee law).

**B. The Subsequent Detention and Search**

For the first time on appeal, Defendant argues that the officers exceeded the scope of the stop inasmuch as the officers had no specific articulable facts generating a reasonable suspicion of illegal activity.

■ It is very well-steeped in Fourth Amendment jurisprudence that once an of-

ficer has completed the purpose of the initial traffic stop, the officer cannot further detain a motorist unless something during the stop caused the officer to form a reasonable suspicion that criminal activity was afoot based upon specific articulable facts. *See Knowles,* 525 U.S. 113, 119 S.Ct. 484, 488, 142 L.Ed.2d 492; *United States v. Mesa,* 62 F.3d 159, 162 (6th Cir. 1995). And, it is equally as well-recognized that a police officer has a duty to conduct the stop with the least intrusive means reasonably available to verify or dispel the officer's suspicion. *See Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Hill,* 195 F.3d at 269. However, Defendant faces a very heavy burden in establishing that the officers failed to comply with this well-founded law inasmuch as Defendant failed to raise these challenges in his motion to suppress the evidence before the district court.

In *United States v. Critton,* 43 F.3d 1089, 1093–94 (6th Cir.1995), this Court faced challenges brought by a defendant based on grounds to suppress the evidence different from those unsuccessfully raised before the district court. Upon review, the Court first noted that it was without "jurisdiction to hear appeals of suppression issues raised for the first time on appeal." *See id.* (citing *United States v. Crismon,* 905 F.2d 966, 969 (6th Cir.1990)). The Court further opined that "a defendant who fails to raise a specific issue as the basis for suppression 'has waived the right to raise that issue on appeal.'" *Id.* (quoting *United States v. Yannott,* 42 F.3d 999, 1005 (6th Cir.1994)). Despite the assertion that it lacked jurisdiction, however, the *Critton* court then proceeded to address the defendant's suppression argument raised for the first time on appeal under a plain error standard. *See id.* at 1094.

More recently, in *United States v. Sheppard,* 149 F.3d 458, 461 (6th Cir.1998), this Court reiterated that it was "categorically without jurisdiction to hear appeals of suppression issues raised for the first time on appeal." The Court went on to note that the defendant had not forfeited his suppression argument raised before the Court; rather, he waived the argument by withdrawing his motion to suppress prior to trial, thereby leaving the Court without jurisdiction to consider the matter. *Id.* In a footnote, the Court explained that "[f]orfeiture is the failure to timely assert a right, whereas waiver is the intentional relinquishment or abandonment of a known right." *Id.* at 461 n. 3 (citing *United States v. Olano,* 507 U.S. 725, 732–35, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). The significance of this difference is that "[p]lain error does not apply to cases of waiver, but may be invoked in the court's discretion to review rights that were forfeited below." *Id.*

As the record stands before the Court in the matter at hand, Defendant's failure to raise these issues as being one of forfeiture, or one of waiver (intentional relinquishment), is difficult to ascertain inasmuch as it is clear the Defendant solely challenged the propriety of the initial stop in his motion to suppress, therefore possible leading one to believe that Defendant intentionally waived these other claims. Indeed, it is only after an unfavorable ruling from the district court that Defendant now raises these additional allegations of error challenging the detention and subsequent search. However, to err on the side of caution, we will review Defendant's claims under a plain error analysis. When reviewing a claim under a plain error standard, this Court may reverse only if it is found (1) there is an error; (2) the error is plain; (3) it affected the defendant's substantial rights; and (4) it seriously affected the fairness, integrity or

public reputation of judicial proceedings. *See United States v. Carter,* 236 F.3d 777, 783–84 (6th Cir.2001).

Defendant argues that the officers' contention that they searched the vehicle and patted Defendant down for weapons for safety purposes because the area is known for drug use and crime fails to meet the requisite level of a reasonable suspicion that criminal activity was afoot based upon articulable facts so as to justify the search. Although we find this argument persuasive, we ultimately hold that Defendant's claim must fail.

■ The jurisprudence surrounding a search incident to a traffic stop is such that during the course of effectuating the purpose of the traffic stop in the least intrusive manner, the officer must have developed a reasonable suspicion that the motorist was engaged in criminal activity and this reasonable suspicion must have been based upon articulable facts. *See Mesa,* 62 F.3d at 162; *see also Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Here, Officer Kiely's reason for conducting the search, because he "normally" does so given the area and its reputation for drugs and crime, fails to meet the standards set forth under the jurisprudence. However, the testimony at the suppression hearing was such that while Kiely was checking on Defendant's driver's license at the patrol car, Defendant had voluntarily exited the car and invited the search, voluntarily lifted his shirt, and voluntarily stood against the patrol car for the patdown. (J.A. at 58.) Specifically, when Officer Kiely asked Defendant if he had any guns or weapons in the vehicle, Defendant responded, "no, Officer Kiely. Go ahead and look. And he stepped out of the car and pulled his shirt up ....." (J.A. at 58.) Accordingly, it would appear that irrespective of Officer Kiely's lack of reasonable suspicion to conduct a search, Defendant gave the officer permission to search his vehicle as well as his person through the lifting of his shirt. Defendant has not raised a challenge to the voluntariness of his consent, and certainly could have answered Officer Kiely's question without providing permission for a search to ensue. Therefore, Defendant's claim fails under plain error review inasmuch as Defendant's consent purged any taint from the officers' lack of reasonable articulable suspicion to search Defendant and his vehicle such that Defendant's rights were not substantially affected.

■ Furthermore, Defendant's claim that even if the search was proper, Officer Gilbert's confiscation of the cocaine in Defendant's pant's front pocket was improper under the "plain feel" exception of *Minnesota v. Dickerson,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). Once again, this claim is subject to plain error review and, once again, Defendant's claim falls short of meeting the plain error review standard. Defendant argues that the fact that the contents of the bag may have been crack cocaine could not have been immediately apparent to Officer Gilbert, and therefore should not have been confiscated under the "plain feel" exception to a warrant requirement. Officer Gilbert testified, however, that through his training at the police academy he became familiar on how to recognize drugs such as this, and through his experience on patrol he knew that crack cocaine was used in this area. (J.A. at 81–82.) Defendant offered nothing to rebut Officer Gilbert's testimony and Defendant has therefore failed to establish that any error occurred.

## CONCLUSION

The district court did not err in denying Defendant's motion to suppress the evidence where Defendant's motion rested on the sole argument that the officers lacked

probable cause to stop his vehicle and this argument fails. In addition, any further suppression claims raised for the first time on appeal fail to meet the requirements of plain error review. Accordingly, we **AFFIRM**.